151 N.J. Super. 15 (1977)
376 A.2d 535
ILENE PEPER, PLAINTIFF-APPELLANT,
v.
PRINCETON UNIVERSITY BOARD OF TRUSTEES, WILLIAM BOWEN, F. SHELDON HACKNEY, ANTHONY MARUCA, WILLIAM REED, BRUCE EDWARDS, AND STANLEY ADELSON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1977.
Decided May 4, 1977.
*17 Before Judges FRITZ, ARD and PRESSLER.
Ms. Kathryn Trenner argued the cause for appellant.
Mr. William J. Brennan, III argued the cause for respondents (Messrs. Smith, Stratton, Wise & Heher, attorneys; Ms. Ann Reichelderfer on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff Ilene Peper appeals from the judgment of the Superior Court, Law Division, dismissing her sex discrimination complaint against defendants Princeton University and six of its executive officers. The gravamen of her complaint is that she was denied promotion within the University's administrative ranks because of her sex. Having resigned from her position in September 1973, several months after the acts of discrimination complained of, she does not now seek either reinstatement or appointment to a promotional office but rather an award of monetary damages. For the reasons herein stated we conclude that her charge of unlawful discrimination in respect of her nonpromotion in July 1973 to the position of administrative officer was clearly proved and it *18 was hence error for the trial court to have dismissed her complaint.
According to the proofs below, plaintiff was first employed by the University in 1960 as a secretary to one Arthur Allen, the personnel director of the so-called Accelerator Project at the Forrestal Campus. Allen, who is still employed by the University, testified on plaintiff's behalf. It was not disputed that at the time plaintiff was first hired, Allen's assistant was a Mr. Feehan, whose employment title was that of administrative assistant, the lowest level of the eight-rank administrative hierarchy. Feehan left the office some six months later and plaintiff assumed his duties, having been promoted to the job title of administrative aid, a secretarial position, not an administrative one. Her performance was of a superior nature, and as the office grew, so did the scope and nature of her administrative responsibilities. Allen, impressed with the quality of her work and convinced that had she been a man, she would have been promoted into the administrative ranks, made seven separate unsuccessful requests to his superiors between 1961 and 1965 for her appointment to the administrative assistant position. Although she received regular salary increments, she did not receive the promotion until the middle of 1965, only several months before she first resigned from the University because of her husband's job relocation out of the Princeton area.
In 1968 the family returned to Mercer County and plaintiff was, at the invitation of the then Director of Personnel, rehired as an administrative assistant in the main personnel office. The office at that time was divided into four sections, wage and salary, employment benefits, training and communication, and recruitment. It was the recruitment section, headed by a Bruce Edwards, an assistant director of personnel, to which she was assigned. Apparently at the time of her rehiring the administrative staff in the personnel office consisted of the Director of Personnel, the four section chiefs (assistant or associate directors of personnel *19 who were at least at the fourth level of the administrative hierarchy) and three assistants, all assigned to recruitment: one Joseph Mignon, one James Barbour, and plaintiff. She was the sole woman. Mignon had come to the University about a year before plaintiff's rehiring and Barbour about a month before. By January 1969 all three had been promoted from the first to the second level in the administrative hierarchy, that of administrative associate. Also in January 1969 Richard Horch, who also testified for plaintiff, took over the personnel office as Personnel Director, a position he held until he left the University in September 1972. The pertinent cast, at least until the events of July 1972, was completed by Horch's hiring of a fourth administrative assistant in the recruitment section, James Oliver, shortly after his own arrival. Oliver was not promoted to the administrative associate level until 1971, an event triggered apparently by Mignon's lateral transfer to the wage and salary section, which had grown sufficiently to warrant employment of an administrative assistant to the section chief.
Horch's testimony, corroborated by the documentary evidence and in no way even remotely disputed, is that from January 1969 until July 1972, plaintiff's job performance was outstanding. She not only competently performed her assigned duties but also initiated a variety of programs which have since become standard University policy. Her responsibilities increased as did the approbation of her superiors. While her merit was recognized by frequent salary raises, she was, however, denied the promotion she sought to the third rank in the hierarchy, the position of administrative officer, and that on the ground that if she were so promoted, her colleagues Mignon and Barbour would also have to be promoted.
In July 1972 Horch, sympathetic with her goal of becoming a higher-level personnel officer, suggested to her that she accept a lateral transfer assistant to the head of the training and communication section, which, like the *20 wage and salary section experience of the year before, had grown large enough to now warrant a second administrative staff member. She accepted this assignment after receiving Horch's assurance that the transfer would have no adverse effect at all on her promotional opportunities but would, to the contrary, enhance them by giving her in-depth experience with another phase of personnel work. The vacancy thus created in the recruitment section was filled by the hiring, as an administrative assistant, of a second woman administrator, Barbara Smith.
Horch, as noted, left the University in September 1972 and was replaced by William Reed, defendants' sole witness. At about that time there was being formulated an administrative development program for the University as part of its affirmative action policies, the purpose of which was to reverse the statistically demonstrated fact that the higher echelons of the administrative staff consisted primarily of white males. The point of the program was to train persons in the two lowest administrative levels, in which the women were concentrated, so that they, together with members of racial minorities, could progress upwards through the ranks. The development of this program after Horch left the University became the responsibility of plaintiff's original section chief, Bruce Edwards, who was promoted to Associate Director of Personnel. That promotion, in University parlance, was an "in-place" promotion, namely an accession to a higher rank in recognition of merit and the performance of increased responsibilities, without, however, an actual change in the job then being performed. Plaintiff, on learning of Edwards' promotion, again sought promotion for herself but was advised by her section chief that someone else had been already slated for appointment to Edwards' original title of Assistant Director of Personnel, a designation not, however, made until some months after her resignation.
In March 1973 plaintiff was the subject of a glowing evaluation report filed by her section chief. She learned *21 several months later that as of July 1, 1973 Barbour, who had remained in the recruitment section, and Mignon, still in the wage and salary section would receive "in-place" promotions to the level of administrative officer, and that Smith was to be promoted to her level of administrative associate, leaving unpromoted only herself and Oliver, who had substantially less seniority than she did as an administrative associate and whose performance, according to Horch's undisputed testimony, was not comparable to hers in quality. Her complaint to both her section chief and Reed regarding these impending promotions, which in fact took place as scheduled, was met by Reed's explanation that he was not personally sufficiently familiar with her work and her abilities and, in order that he might be able to make his own evaluation thereof, requested her, in addition to the duties she was already executing, to perform two projects for him. One was to develop and execute a program of explaining to all University personnel a new grievance procedure which was about to be implemented, and the other was the development of a performance appraisal program for the University's "non-exempt" staff. These were both projects in which he testified he was "personally interested" and which were in fact satisfactorily carried out by plaintiff.
During the summer and early fall of 1973, while plaintiff was completing her special assignments for Reed, the personnel office was engaging in a reorganization referred to as "Plan A." The reorganization was to include the designation of five regional representatives who would ultimately be accorded the rank of administrative officer, the level which plaintiff had thus far been unsuccessful in reaching, and she was told that one of those jobs would be hers. In September a male administrative officer from elsewhere in the University, who was also scheduled to be one of the five regional representatives, was temporarily assigned to the recruitment section of the personnel office in order to learn its functions. Plaintiff, convinced that her training, *22 experience, ability and performance were all superior to his and affronted by the fact that he had already achieved an administrative level denied to her although he was just beginning to be trained in personnel functions she had long since performed, tendered her resignation, which was "regretfully" accepted by Reed. "Plan A" was implemented the following July, with Barbour receiving Edwards' title and Mignon, Oliver and Smith designated as regional representatives.
The trial judge's conclusion, drawn from this largely undisputed evidence, was that plaintiff's failure to be promoted, first to Edwards' job title in November 1972 and her subsequent failure to be promoted to the rank of administrative officer in July 1973, was not the result of sex discrimination but was rather due to there being no vacancy available to which she could have been promoted, and had she remained at the University she would have achieved the promotion as part of the Plan A implementation.
We agree with the trial judge that plaintiff failed to bear the burden of proof as to the first promotional failure complained of. There is, in fact, nothing in this record to contradict the contention of the University that Edwards' position was intended to be filled only as part of the July 1974 implementation of Plan A. Nor is there anything in the record, other than the rankest hearsay, to suggest that had she remained she would not have been considered for that position. We are constrained, however, to conclude that there was no lawful justification for the denial to plaintiff of an "in-place" promotion to the rank of administrative officer together with Mignon and Barbour in July 1973. That conclusion is mandated by applicable statutory law and its judicial construction.
Plaintiff's complaint relied on both state and federal civil rights legislation, more particularly, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and the federal act mandating equal employment opportunities, 42 U.S.C.A. § 2000e et seq. The trial court concluded that *23 relief could not be based on the federal legislation because the complaint, in violation of 42 U.S.C.A. § 2000e-5(e), had been brought more than 180 days following the act of discrimination complained of. We do not further consider the applicability, however, of the federal legislation because we are satisfied that plaintiff is entitled to the relief she seeks pursuant to state legislation.
The New Jersey Law Against Discrimination was amended in 1970 to include age, marital status and sex as proscribed bases for employment discrimination. N.J.S.A. 10:5-4, 10:5-12(a). There is no question that both the University and the named individual defendants are employers within the intendment of the act, N.J.S.A. 10:5-5(e)[1], and that plaintiff is an employee within the intendment of the Act, N.J.S.A. 10:5-5(f). Nor do we doubt that while pursuit of administrative relief from the Division on Civil Rights might have been more appropriate and expeditious than direct resort to the court, plaintiff was nevertheless entitled to invoke the Superior Court's concurrent jurisdiction over practices alleged to be in violation of the Law Against Discrimination. See Gray v. Serruto Builders, Inc., 110 N.J. Super. 297 (Ch. Div. 1970). The sole question, then, is whether a proscribed act of discrimination was proved, the trial judge's conclusion to the contrary notwithstanding.
The mandate of the law is unequivocal. N.J.S.A. 10:5-4 declares as a civil right the opportunity of all persons to obtain *24 employment without discrimination because of sex. N.J.S.A. 10:5-12(a) declares it an unlawful employment practice for an employer to discriminate against an employee in respect of the terms, conditions and privileges of employment for reason of sex where sex is not a bona fide occupational qualification, an exception not here urged. While the practice of discrimination in employment is thus clearly proscribed, an act of unlawful employment discrimination is perhaps more difficult to prove than any other proscribed act of discrimination, and the higher the job level, the more difficult the proof. That consequence follows, of course, from the variety of subjective factors which may legitimately come into play when people are evaluated for executive positions which require the exercise of substantial authority, initiative and discretion. This complaint does not, however, present the difficulties typically encountered in discrimination cases involving high-level jobs and, consequently, sophisticated employer judgments. Here there is no question at all regarding either plaintiff's qualifications or the comparability of her qualifications to those of her male colleagues who received the promotions to the rank of administrative officer. Thus, all of the prerequisites for proof of a prima facie employment discrimination case appear in this record without dispute and without a need to resort to credibility judgments in respect of the testimony of the witnesses. Plaintiff is a member of a group, namely women, which the University has conceded through its own affirmative action programs has historically been denied equal opportunity for employment within the administrative hierarchy. She was qualified for the promotion. Her request for promotion was denied. Men having no greater qualifications were subsequently promoted. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
The essence of discrimination is, of course, disparate treatment. Plaintiff was treated disparately from her two male colleagues. They were promoted and she was not. She *25 was required to perform additional assignments by way of promotional tests and they were not. In this posture, and in view of plaintiff's establishment of a prima facie case, it then became incumbent upon the University to come forward with an explanation at least suggestive that the admitted disparate treatment was not based on her sex. This it utterly failed to do. First, the promotions of Barbour and Mignon were "in-place" promotions. Their responsibilities and duties did not change. There was no suggestion by the University of any reason why plaintiff, although previously transferred to a different section, should or could not have been accorded the same "in-place" promotion, particularly in view of the fact that that transfer had been represented by Horch as specifically intended to enhance her promotional opportunities. The failure of either her "in-place" promotion in that section or her transfer back to the recruitment section for an "in-place" promotion is impossible to reconcile with any attempted justification. Nor is it any answer for the University to say, as it does, that had plaintiff only been patient, she would have had her promotion in July 1974. A subsequent voluntary rectification of an earlier act of discrimination may be laudable. It does not, however, erase the discriminatory act which has already taken place.
Since we are satisfied that plaintiff was indeed discriminated against because of her sex in July 1973 and that such discrimination was the real reason she did not then advance to the level of administrative officer, she is clearly entitled to the monetary damages she seeks. We accordingly remand to the trial court for the assessment of compensatory damages. Plaintiff shall have the opportunity to produce such proofs as she deems appropriate in respect both of her alleged out-of-pocket and humiliation damages. See Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399 (1973). The judge should conduct a supplemental pretrial conference on this issue in order to ascertain what, if any, further discovery may be necessary in respect of the damages issue and to attempt *26 to arrive at whatever additional delineation of the issues may be appropriate.
Several additional issues require consideration. First is the status of the individual defendants, a grouping including Princeton's President, Provost, Vice-President for Administrative Affairs, Personnel Director, Associate Director of Personnel and Administrative Director of Personnel. While we are reversing the dismissal of the complaint in favor of the University, we are not satisfied that a viable cause of action was proved against any of the individual defendants, who had varying degrees, if any, of involvement with plaintiff. We are satisfied that the discrimination proceeded from an implementation of University policy for which the University itself should, in the final analysis, be held responsible.
Finally, plaintiff appeals from an interlocutory order of the assignment judge of Mercer County denying her application for the disqualification as the trial judge of any member of the county judiciary who had theretofore been named as a defendant in an unrelated sex discrimination action involving the Mercer County Probation Department. The trial judge here was one of those named defendants. In view of the fact that virtually the entire Mercer County judiciary was named in that pending action, and in view of the further fact that no particular bias or prejudice on the part of the actual trial judge was demonstrated in advance of the trial, we see no reason to interfere with the assignment judge's exercise of discretion in denying the motion. See R. 1:12-1(f). We are further satisfied from our review of the record that the trial was conducted in every respect with utmost fairness to all of the parties.
Reversed and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.
NOTES
[1] The respondents themselves did not argue that they were not employers within the act. We are satisfied that the exclusion contained in N.J.S.A. 10:5-5(e) must be read in pari materia with N.J.S.A. 10:5-5(l) and hence that the exclusion does not apply to any facility which is itself a public accommodation as defined by N.J.S.A. 10:5-5(l). We are convinced that the Legislature did not intend the anomaly that a facility which is prohibited from proscribed discrimination in its function as a public accommodation should nevertheless be free to invidiously discriminate in its function as an employer.