696 P.2d 871

**Walter MERRITT, Guardian ad Litem, for Deborah Ann MERRITT, a minor, Plaintiff-Respondent, Cross-Appellant,**

v.

**STATE of Idaho, Defendant-Appellant, Cross-Respondent.**

No. 15043.

Supreme Court of Idaho.

Feb. 5, 1985.

Michael E. Ramsden, of Quane, Smith, Howard & Hull, Boise, for defendant-appellant, cross-respondent.

Thomas A. Mitchell, and Michael J. Vrable, Coeur d'Alene, for plaintiff-respondent, cross-appellant.

DONALDSON, Chief Justice.

Walter Merritt initiated this action against the State of Idaho and Bonner County as guardian ad litem for his daughter Deborah. He alleged that they were negligent, first, in allowing Deborah to be confined in an inappropriate detention facility and, second, in allowing her to be subjected to an alleged assault while so confined. Bonner County settled prior to trial. The case was tried to a jury. The jury returned a special verdict finding the State of Idaho 75% negligent and Bonner County 25% negligent. Damages were assessed at $100,000.00. This appeal followed.

On appeal the State of Idaho contends: (1) that it is immune from liability under I.C. §§ 6–904(1) and (4); (2) that it was entitled to a directed verdict on the issue of negligence; and (3) that it is entitled to a new trial based on any of the following: the trial court's admission of prejudicial testimony, the trial court's failure to instruct the jury on Deborah's contributory negligence, jury misconduct, or excessive damages. Because we hold that the State of Idaho was not negligent, as a matter of law, and thus, that the trial court's judgment must be reversed, we do not address the rest of the State's contentions.

The State of Idaho, Department of Health & Welfare (the Department) first became involved with Deborah Merritt in 1977. Deborah's parents were divorced in 1975 and she lived with her father. Deborah's relationship with her father was troubled and she ran away from home repeatedly. The Department pursued various placements for Deborah including protective supervision at home, placement with her natural mother, and placement in foster homes. On December 5, 1978, Deborah was found in the Sandpoint Bowling Alley carrying a notarized letter, signed by her father, stating that he denied all responsibility for her care or actions. Deborah was eleven years old at the time. Following this incident, Deborah was placed in the legal custody of the Department for one year. Prior to the expiration of the custody order, Deborah was returned to her father's home on a trial basis. Her relationship with her father seemed to improve and she remained at home following the expiration of the custody order. However, the situation at home again deteriorated and on February 15, 1980, Deborah ran away and was at large until February 19 when she turned herself in to the Bonner County Sheriff's Office asking to be placed in detention. She was held in jail overnight and returned to her father's custody the next day. On February 21, 1980, Deborah ran away again. Deborah's father did not file a runaway report and it was not immediately known that she was missing.

On March 3, Deputy Prosecutor Phil Robinson filed a motion with an accompanying affidavit by Allen Koski, a Department social worker, asking the court to enter an order of temporary shelter for the still missing Deborah. An order directing that Deborah be placed in foster care was signed on March 4. Deborah was finally located on March 7 and was placed in a foster home. She had been living with a 21-year-old male during the period that she was missing.

Pursuant to I.C. § 16–1614 and Rule 8 of the Idaho Juvenile Rules, a shelter care hearing to determine whether Deborah should remain in the custody of the Department was scheduled for March 10. However, because Walter Merritt was not served with notice of the hearing, it was continued until March 12. On March 10, the magistrate, anticipating that Deborah might not appear at the hearing, issued a supplemental order which provided in part:

"If Deborah Merritt shall for any reason without prior authority and authorization from the Department of Health and Welfare leave said shelter care placement or home prior to the adjudication of

the above-entitled matter and hearing on the same, the same shall be grounds for contempt. Upon notification of the same a peace officer of the State of Idaho or subdivision thereof shall take into custody the said Deborah Merritt and place her in the juvenile detention facilities at the Bonner County Jail or the most accessible jail or detention facilities available to said law enforcement agency. Further, upon the occurrence of the above, said child shall not be released from detention until further order of this Court.

On March 11, Deborah skipped school and failed to return to her foster home. On March 13, Koski discovered that she was at a local motel with an adult male. Deborah was then picked up by the Sandpoint Police and handed over to the custody of the Bonner County Sheriff to be detained in the Bonner County Jail pursuant to the March 10 Order.

Pursuant to I.C. § 16–1811 and Rule 17 of the Idaho Juvenile Rules, a hearing was held on March 14 to determine whether Deborah should remain in detention. Social worker Warren Middlemist, the Department's representative at the hearing, recommended that Deborah be placed back in foster care. Deborah was present at the hearing and was represented by counsel. When questioned by the magistrate, she stated that she would run away if she were returned to her father or placed in foster care and that she preferred to remain in jail.

Under Rule 17, the court may order a child to be held in detention under the following circumstances: .

"(1) when the child has run away from his parents, guardian or legal custodian and the court has reason to believe that said child will remain away from his parents, guardian or legal custodian during the pendency of the proceedings, and that such absence from his parents, guardian or legal custodian would be detrimental to his welfare; or

"(2) the court has reasonable grounds to believe that the child will not appear before the court or its officers at such time as the court may order; or

"(3) the court has reasonable grounds to believe that said child will, during the pendency of the juvenile proceeding, be subjected to an environment or to persons whose effect upon said child would be injurious to said child's welfare, [;] or

"(4) the court has reasonable grounds to believe that release of said child would endanger said child or society." I.J.R. 17 (1980).

Based on the foregoing rule, the magistrate issued an Order of Detention providing that Deborah was to remain in the custody of the Bonner County Sheriff pending further proceedings. Walter Merritt was present at the hearing and consented to Deborah's remaining in detention at the county jail. The magistrate made the following Findings of Fact and Conclusions of Law in support of his decision to continue Deborah in detention:

"1. The above-named child has failed to appear for previous hearings set before this Court, and specifically on March 12, 1980.

"2. The above-named child has presently run away from her parent, Walter Merritt, and the Court has reason to believe that said child would remain away from her parent during the pendency of these proceedings.

"3. The above-named child has run away from the previous shelter home, the home of Sandy Belote, and the Court has reason to believe that the child would not remain in a foster care home pending further proceedings, but that said child would likely run away from a temporary shelter home.

"4. The Court believes that the child will not appear before the Court at such time as the Court may order future hearings herein.

"5. The Court has reasonable grounds to believe that the child, during the pendency of these proceedings will be subject to an environment and persons whose effect upon said child would be injurious to the child's welfare."

The magistrate scheduled an adjudicatory hearing (I.C. § 16–1608) for March 26 to determine whether Deborah was within the purview of the Child Protective Act (CPA). At that hearing the magistrate found that Deborah was within the purview of the CPA and that her custody should be vested in the Department. On March 28, 1980, a decree was entered vesting Deborah's custody in the Department for a period of not to exceed one year from the date of entry. Since it was not possible for the Department to place Deborah immediately, it was further ordered that Deborah be detained at the Wallace Regional Detention Facility pending placement by the Department. The Bonner County Sheriff's Office was ordered to transport Deborah to Wallace. Deborah was transported by the sheriff's office on March 31.

In the meantime, Deborah remained in the Bonner County Jail where she was housed in a cell designed for adult prisoners. She had no access to a radio or television and testified that she did not recall receiving any reading material. An adjacent cell contained adult offender Richard Hendrickson, charged with aggravated assault and rape.

During the evening of March 26, after the adjudicatory hearing, Deborah's toilet overflowed. The jailer released her from her cell and told her to clean up the mess. He then left her unsupervised in direct contravention of the jail's written policy which required that a deputy or jailer had to be in the cellblock at any time a prisoner was out of his or her cell. According to Deborah, as she was returning to her cell after emptying the mop bucket, Hendrickson called out to her and offered her a cigarette. She testified that she walked up to his cell door and that he reached through the door opening with one arm and grabbed her cover-alls. He then used the same arm to reach into her cover-alls and fondle her breasts. Deborah testified that the incident lasted for two or three minutes and that she received a small scratch. She reported the incident to Deputy Sheriff Biggerstaff on March 27. It is this incident which serves as the basis for respondent's negligence claim.

In order to establish negligence, respondent must first show that the State of Idaho owed Deborah a legal duty and that the State's actions toward her amounted to a breach of that duty. See Alegria v. Payonk, 101 Idaho 617, 619, 619 P.2d 135, 137 (1980); W. Prosser and W. Keeton, The Law of Torts § 30 (5th Ed.1984). Respondent contends that the State of Idaho, Department of Health & Welfare, owed Deborah a duty of reasonable care and that it breached that duty when it allowed her to be confined in an inappropriate detention facility.

Under the Child Protective Act, Idaho Code, Title 16, Ch. 16, the State of Idaho has a duty to provide for the welfare and protection of abused, abandoned and neglected children. "Each child coming within the purview of this Act shall receive, preferably in his own home, the care, guidance and control that will promote his welfare and the best interest of the State of Idaho, and if he is removed from the control of his parents, guardian or other custodian, the State shall secure adequate care for him." I.C. § 16–1601 (1979). In recognition of this duty, the Department, upon discovering that Deborah was at large in the community, filed a petition asking the court to enter an order of temporary shelter for her. The petition indicated that Deborah had been missing for 10 days at the time it was filed, that her father had not informed anyone that she had left home, and that he had not filed a runaway report so that the local authorities could have picked her up. Respondent concedes the propriety of the Department's actions in ensuring that Deborah was located and placed in shelter care, however, he contends that the Department, thereafter,

breached its duty to Deborah by allowing her to be detained in the Bonner County Jail. Respondent does admit, however, that he consented to Deborah being held in the Bonner County Jail pending an adjudicatory hearing to determine who should have legal custody of her.

■ Deborah was jailed under a contempt order. It was the magistrate, not the Department, who placed Deborah in the Bonner County Jail. In fact, the testimony at trial indicates that the Department recommended at the March 14 hearing that Deborah be returned to shelter care rather than held in detention. The magistrate had jurisdiction over Deborah beginning at the moment she was taken into custody on March 13. I.C. § 16–1811. Deborah remained in jail pursuant to a court order issued after a hearing. She was represented by counsel at each stage of the proceedings and appeared before a magistrate before any action was taken. The hearing was held in accordance with Idaho Juvenile Rule 17 which provides the guidelines under which a *court* may order a juvenile into detention. The Department of Health & Welfare has no authority to put a child in detention, nor does it have the authority to take a child out of detention without a court order. In fact, the March 10 Supplemental Order specifically provided that "said child shall not be released from detention until further order of this Court."

■ I.C. § 16–1812 provides that a jail may be used as a detention facility if it meets the standards of I.C. § 16–1812A. That section requires, among other things, that juveniles be segregated from sight and sound of adult prisoners, that they have access to reading materials, and that they receive supervision and observation adequate to protect their physical and mental health. The Bonner County Jail was deficient in all three respects. Deborah was able to converse with adult prisoners, she did not have reading materials, and she was left unsupervised, allowing the assault to occur. However, it is the county commissioners and the court, rather than the Department of Health & Welfare, who are responsible for providing adequate juvenile facilities. "The County Commissioners shall provide a detention home or homes for the temporary detention of children to be conducted by the court, or, subject to the approval of the court, by other appropriate public agency, provided that such detention shall comply with the provisions of section 16–1812A, Idaho Code ...." I.C. § 16–1812 (1979).

■ Based on the foregoing, we conclude that once the court ordered Deborah into detention at the Bonner County Jail, the Department was entitled to rely on the sheriff's office to discharge its statutory duties pursuant to court order. One who is required by law to assume the custody of another so as to deprive him of his normal power of self-protection or to subject him to association with persons likely to harm him, has a duty to exercise reasonable care to protect him from harm. Restatement (Second) of Torts §§ 314A and 320 (1965). This duty is specifically applicable to a police officer or to a jailer at a penal institution. *Id.* § 320.

The Department of Health & Welfare cannot be held responsible for the conditions and operating procedures in county jails. The Department did not have custody of Deborah until March 28, 1980 when the magistrate's decree was entered, and, absent a showing of custody, had no duty to control the conduct of third persons so as to protect her from harm. *Id.* § 315. It was Bonner County's responsibility to insure that the Bonner County Jail complied with the standards set forth in I.C. § 16–1812A for juvenile detention facilities. I.C. § 16–1812. However, Bonner County settled prior to trial and is not a party to this law suit.

Respondent further contends that the Department was negligent in not ensuring that Deborah was transported to Wallace immediately after the March 26 adjudicatory hearing. I.C. § 16–1610 sets forth the requisite disposition procedure when the evidence presented at an adjudicatory hearing demonstrates that a child comes within the purview of the CPA. That section re-

quires the court to issue a written decree containing the findings of fact and conclusions of law upon which it bases its exercise of jurisdiction over a child. Upon entry of its decree, one of the alternatives available to the court is to vest legal custody in the Department of Health & Welfare. That decree becomes binding on the Department from the date it is entered and continues to be binding for an indeterminate period not to exceed one year. I.C. § 16–1610 (1979). *See also,* I.J.R. 12 (1980).

Pursuant to the above requirements, the magistrate on March 28, 1980, entered an "Order of Legal Custody." The Order provided:

"IT IS HEREBY ORDERED that legal custody of Deborah Merritt is committed to the Idaho Department of Health and Welfare for an indeterminate period not to exceed one (1) year from the entry of this order.

"IT IS FURTHER ORDERED that said child be placed in the Department of Health and Welfare Regional Center, Wallace, Idaho, pending placement by the Department of Health and Welfare. Transportation to said Regional Center to be provided by the Bonner County Sheriff's Office."

Thus, it is apparent that the Department did not have legal custody of Deborah until the court entered its decree on March 28, 1980. Absent legal custody, the Department had no authority to transport Deborah anywhere and cannot be found negligent for failing to transport her on March 26.

■ Our conclusion that the Department did not have legal custody until the court entered its written decree is consistent with the general rule in Idaho requiring a written order before a judgment is final. For example, the time for filing an appeal does not begin running until after the date of entry of the written order or decree. *See* I.R.C.P. 83(e) (1980); I.A.R. 14 (1980). A premature notice of appeal, filed before entry of a written order or decree, is held in abeyance and does not mature until the written judgment is filed. *State v. Gissell,* 105 Idaho 287, 668 P.2d 1018 (Ct.App.1983). Similarly, I.R.C.P. 54(d)(5) provides that a Memorandum of Costs must be filed within ten (10) days after entry of judgment. In interpreting this rule, this Court held that the legislature intended to refer to a written pronouncement signed by the judge and filed with the clerk. *Big O Tires of Idaho, Inc. v. Hanley,* 101 Idaho 56, 57, 608 P.2d 413, 414 (1980) (quoting *Page v. Noland,* 85 Idaho 369, 373, 379 P.2d 661, 663 (1963)).

As we stated above, I.C. § 16–1610 requires the court to set forth the findings of fact and conclusions of law which constitute the basis for its jurisdiction. In *Sorenson v. Adams,* 98 Idaho 708, 571 P.2d 769 (1977) (*overruled on other grounds Owen v. Boydstun,* 102 Idaho 31, 624 P.2d 413 (1981)), we noted that a judge's bench remarks may be quite different from his or her ultimate written findings. "Benchmarks, sometimes referred to as tentative impressions of what the evidence shows, do not substitute nor rise to the dignity of written findings of fact and conclusions of law, either separately stated, or embodied in a written memorandum opinion." *Id.* 98 Idaho at 713, 571 P.2d at 774. In *Stewart Min. Co. v. Ontario Min. Co.,* 23 Idaho 724, 132 P. 787 (1913), *aff'd,* 237 U.S. 350, 35 S.Ct. 610, 59 L.Ed. 989 (1915), the appellant assigned as error a portion of the trial judge's oral holding announced at the end of the trial. In disposing of this assignment of error, this Court stated:

"under the statutes of this state and the rule of law frequently announced by this court these remarks or observations of the trial court were no part of the decision of the court. The decision consists of the findings of fact and conclusions of law which must be in writing and filed with the clerk." *Id.* 23 Idaho at 736, 132 P. at 792.

Finally, we note that the magistrate specifically ordered the sheriff's office to transport Deborah to Wallace. It appears from the evidence adduced at trial that the Bonner County Sheriff's Office was the

only agency that transported juveniles between detention centers. Specifically, Gary Finney, who was the Bonner County Prosecuting Attorney in March of 1980, testified that in the ten years preceding this incident, no one in Bonner County other than the sheriff's office or the State Police had ever transported a juvenile between detention centers.

All the record shows that the Department was responsible for in this case was initiating a petition providing for foster care for a runaway teenager who had been at large in the community for ten days. We hold that the respondent has failed to establish that the State of Idaho was negligent and, thus, the damage award must be reversed.

Respondent has cross-appealed objecting to the trial court's dismissal of County IX of his amended complaint. Count IX sought damages against the State for violations of Deborah's constitutional rights under 42 U.S.C. § 1983.[1] The trial court held that a state is not a person under § 1983 and dismissed Merritt's claim.

The vast majority of cases under § 1983 are brought in federal court where states are immune from liability under the eleventh amendment to the United States Constitution. Thus, only a handful of cases have addressed the issue of whether a state is a person under § 1983.

In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the United States Supreme Court held that Congress, in adopting the provision which is now § 1983, did not intend to subject the States to liability since such liability would have deprived the states of their immunity from suit under the eleventh amendment. We interpret *Quern v. Jordan* to hold not only that § 1983 does not abrogate the states eleventh amendment immunity, but also as holding that states are not "per-

sons" for purposes of § 1983. As Justice Brennan's concurring opinion points out, the majority opinion implicitly includes such a decision. *Id.* at 350, 99 S.Ct. at 1150 (Brennan, J., concurring). The majority of state courts which have addressed this issue are in accord. *See State v. Green*, 633 P.2d 1381 (Alas.1981); *Boldt v. State*, 101 Wis.2d 566, 305 N.W.2d 133 (1981), *cert. denied*, 454 U.S. 973, 102 S.Ct. 524, 70 L.Ed.2d 393 (1981); *DeVargas v. State ex rel N.M. Dept. of Corr.*, 97 N.M. 450, 640 P.2d 1327 (N.M.App.1981); *Edgar v. State*, 92 Wash.2d 217, 595 P.2d 534 (1979), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1026, 62 L.Ed.2d 760 (1980).

Thus we affirm the trial court's dismissal of Count IX of respondent's Amended Complaint on the grounds that the State of Idaho is not a person under 42 U.S.C. § 1983.

The decision of the trial court is affirmed in part, and reversed in part.

No costs or attorney fees on appeal.

BAKES and SHEPARD, JJ., concur.

HUNTLEY, Justice, dissenting.

For the reasons stated in Justice Bistline's dissent, I would reject the State's invitation (accepted by the majority) to re-find the facts.

One trial judge found on denial of motion for summary judgment that the facts alleged stated a cause of action in negligence against the State (Department of Health and Welfare); eleven jurors, properly instructed, found tort liability as a matter of fact; a second trial judge ruling on post-trial motions found that the record supports the eleven jurors. Now, on appeal, three justices re-find the facts, overruling two district judges and eleven jurors—a marvelous system indeed where three anointed

1. 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proceeding for redress."

only to rule on matters of *law*, can overrule the eleven others by re-finding *facts*.

The key flaw in the *ratio decidendi* of the majority opinion is centered on the following sentence (P. 875).

> It was the magistrate, not the Department, who placed Deborah in the Bonner County Jail.

The logic presumably is that although it might be negligence for the *Department* to put a 12-year-old girl in an adult jail, it can insulate and absolve itself from the consequences of such negligence by prevailing upon a *magistrate* to perform the tort! No authority is cited for such a proposition, and if such is to be now established as Idaho law, perhaps we should re-examine the rationale for the doctrine of judicial immunity.

The majority now states:

> In fact, the testimony at trial indicates that the Department recommended at the March 14 hearing that Deborah be returned to shelter care rather than held in detention.

However, the fact is that although the Department may have recommended shelter care, its representatives knew the Court was ordering transfer to Wallace, and further knew that in the absence of their making agreements for immediate transfer that Deborah would be incarcerated in the adult jail.

The majority's flaw in reasoning aside, the fact is that the Department's negligence (indeed, *intentional* violation of the legal standards for incarceration of children) both before and after the magistrate acted is well-documented.

Accordingly, I dissent. Hence, I would reach the primary issue raised on appeal, that being whether the State is insulated from immunity under Section 6–904 of the Idaho Tort Claims Act, as *judicially amended*[1] by this Court's decisions in *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21 (1979) and

*Chandler Supply Co. v. City of Boise*, 104 Idaho 480, 660 P.2d 1323 (1983).

The trial bench and bar should know that *Chandler* (and *Dunbar* as amended by *Chandler*) do not now command a majority on this Court. Both Chief Justice Donaldson and Justice Bistline dissented in *Chandler*. Justice Donaldson wrote:

> To countenance the construction of the discretionary function exception of I.C. § 6–904(1) adopted by the majority would be to emasculate the Idaho Tort Claims Act, Title 6, Ch. 9, I.C. To construe the discretionary function exception to apply to all planning and operational decisions in traditional governmental functions does not further the general purpose of the Act as expressed in I.C. § 6–903(a). I dissent. *Chandler, supra,* 104 Idaho at 486, 660 P.2d 1323.
>
> I dissent from the majority opinion because I perceive that its construction of the discretionary function exception emasculates the legislature's intent to permit recovery in a broader spectrum of cases and for all practical purposes nullifies the intent and purpose of the Idaho Tort Claims Act. It leaves the victims of negligent conduct by the State without recourse. *Id.* 104 Idaho at 489, 660 P.2d 1323.

Idaho's Tort Claims Act (and its waiver of sovereign immunity subject to certain exceptions) closely follows the Federal Tort Claims Act. Both the federal act and the state act were working well prior to *Dunbar* and *Chandler*, that is, citizens were generally given at least partial redress for wrongs committed by government while the treasury was protected from excessive or unwarranted judgments. *Dunbar* and *Chandler* have, by the fiat of three Justices, essentially repealed and nullified the legislature's declared purpose that Idaho government should do justice to its citizens. It was decisions such as *Dunbar* and *Chandler* which prompted Kenneth Culp

---

1. For a comprehensive analysis of the argument that Dunbar and Chandler are inconsistent with the Idaho Tort Claims Act, and in effect largely repeal it, *see,* A.G. Hall, "Sovereign Immunity and Re-emergence of the Governmental/Proprietary Distinction: A Setback in Idaho's Governmental Liability Law", 20 Idaho Law Review 197.

Davis in his treatise "Tort Liability of Governmental Units," 40 Minn.L.Rev. 751 at 770 to observe:

> Judicial responsibility for sovereign irresponsibility in tort goes far beyond the original invention and elaboration of the immunity doctrine. Even when legislative bodies became convinced that tort plaintiffs should be allowed to sue the sovereign, and even when clear and unequivocal statutes are enacted authorizing such suits, the courts have characteristically nullified such legislation by interpreting it to mean that sovereign irresponsibility must continue!

One would hope that Idaho's trial judges, when presented in the future with cases requiring application of the Idaho Tort Claims Act, would recognize the view of the current majority on this Court. Our trial judges, rather than wreaking further hardships on the people of Idaho, should return to an application of the legislative will as set forth in the statute prior to the "amendments" wrought by *Dunbar* and *Chandler*. The burden of carrying future appeals should rest upon those who would seek to subvert the legislative will.

BISTLINE, Justice, dissenting.

The majority apparently experiences no problem in upsetting a jury verdict and the well-reasoned opinion of the district judge by the simplistic expedient of making two findings of fact which are pitifully disguised as appellate conclusions of law:

> (A) ... that once the court ordered Deborah into detention at the Bonner County Jail, the Department was no longer responsible for her care.
>
> (B) ... The Department was entitled to rely on the Sheriff's office to discharge its statutory duties pursuant to court order.

Not unremarkably the majority cites no authority whatever for the foregoing—which of itself serves to expose the same for the findings of fact which they indeed are. Having made those two findings contrary to the findings of the jury, the majority adds that "The Department of Health and Welfare cannot be held responsible for the conditions and operating procedures in county jails." Now, there is a statement with which most should agree—even as I do. But, that statement is a far cry from going to the heart of the problem, i.e., that Department employees certainly do have a responsibility to know of the jailhouse conditions and operating procedures of the particular jail in which *their* 12-year-old charge is confined.

As is usually the case, the district judge who presided over the trial without doubt can be expected to have a far better grasp of the pros and cons of the controversy than appellate judges reviewing a cold record. As a matter of sound appellate practice, the beginning of most appellate reviews should commence with a review of the district court's ORDER DENYING MOTIONS FOR NEW TRIAL, and, alternatively, FOR NEW TRIAL. It has always been recognized that a motion for a new trial is essentially an inexpensive appeal from the jury verdict and errors alleged to have occurred at trial. Where a district judge has expended thirty days of time and considerable effort in considering issues raised on the Department's motions for new trial and judgment n.o.v., and provides an 18-page disposition of those issues, it ill-behooves the majority to completely disregard the same in preference to two bald findings of its own thinly disguised as legal conclusions wholly unsupported in law or fact.

To expect any reasonable legal mind to join an opinion which is premised only on (A) and (B) above set forth is asking too much. The science of jurisprudence is poorly served this day. Plaintiff's counsel and those members of the trial bar acquainted with the history of this and the Department's heavy reliance on the discredited majority opinion in *Chandler Supply Co., Inc. v. City of Boise*, 104 Idaho 180, 660 P.2d 1323 (1983), may well wonder if the justices who join the Chief Justice's opinion are firm in their convictions, or whether they have joined it as preferential to a revised *Chandler*.

Responsive to the Department's post-judgment motions, the district judge set out an exhaustive summation of the evidence which had been presented to the jury:

"Deborah Ann Merritt, the daughter of Walter Merritt, was twelve years of age at the time the cause of action arose in this case in March, 1980.

"On March 3rd, 1980, Allan Koski, a Social Service Worker for the State of Idaho, Department of Health and Welfare, stationed in Sandpoint, Bonner County, Idaho, caused to be filed with the Court an Affidavit and Motion requesting an Order for temporary shelter care of Deborah under the Child Protective Act *Idaho Code 16–1601 et seq.*

"The reasons for Koski's action are recited in his Affidavit as follows:

*'2. Deborah Merritt left home on February 21, 1980. Mr. Merritt did not inform anyone that she had left home nor file a runaway report so that local law enforcement could have picked her up. Deborah also ran away on February 15, 1980, and finally asked the Seriff's (sic) Department to place her in detention as her father did not want her back home nor did she want to return to his home. It is this worker's understanding that Deborah is presently living with another minor or adult who is not responsible for her care. Deborah has not been in school since February 21, 1980, the date she ran away from home. It is this worker's belief based on knowledge of this child's emotional state and maturity level, that she is incapable of caring for herself and there is no one who is taking the responsibility for her. This worker has contacted both the local Police Office and Sheriff's Department and neither law enforcement agency feels she is in imminent danger and therefore cannot shelter her. It is this worker's opinion that this child is at high risk and that appropriate action needs to be taken to have her placed in shelter care. 3. That I believe the best inter-*

*ests of the above-named child(ren) re-quire immediate removal from the persons presently exercising care and control of said child(ren), for said child(ren)'s immediate care and protection.'* (See Bonner County Case No. 18420–CPA–Plaintiff's Exhibit # 3).

"At the time of filing the Motion for temporary shelter, Deborah had not violated any criminal laws of the State of Idaho.

"On March 4th, 1980, the Magistrate ordered Deborah to be placed in *'a place of shelter' by the Department of Health and Welfare* and that *the Sheriff* of Bonner County *could assist the Department* of Health and Welfare if necessary.

"On March 7, 1980, Deborah was placed in a shelter care home and a Court notice was given to the Juvenile's Father, Walter Merritt, that a Court hearing would be held on March 10 *'to determine whether custody of the above named child should remain in the Idaho Department of Health and Welfare pending an adjudicatory hearing on the merits of the Petition.'* (Plaintiff's Exhibit #3).

"Because of Deborah's propensity to run away, the Magistrate entered a supplemental Order on March 10, 1980, attempting to secure her presence in the shelter home and at the adjudicatory hearing. The Magistrate's Order provided in part as follows:

*'If Deborah Merritt shall for any reason without prior authority and authorization from the Department of Health and Welfare leave said shelter care placement or home prior to the adjudication of the above entitled matter and hearing on the same, the same shall be grounds for contempt. Upon notification of the same a peace officer of the State of Idaho or subdivision thereof shall take into custody the said Deborah Merritt and place her in the juvenile detention facilities at the Bonner County Jail or the most accessable accessable (sic) jail or detention facilities available to said law enforcement agency. Further, upon the occurrence of the above, said child shall not be*

*released from detention until further order of this Court.'*

"March 11th, 1980, Deborah skipped school and failed to return to her shelter home. Koski discovered that Deborah was at a local motel with an adult male, notified the Bonner County Sheriff of the Court's detention Order and Deborah was taken into custody by the Sandpoint City Police and handed over to the custody of the Bonner County Sheriff's Office to be detained in the Bonner County Jail, all occurring on March 13, 1980.

"A new Court date was set for March 14th and then continued to March 26th, 1980.

"In the interim, Deborah was placed in a jail cell in the Bonner County Jail from March 13, 1980, until March 31, 1980, at which time she was transferred to the Juvenile Detention Facility at the Regional Jail in Wallace, Shoshone County, Idaho.

"The evidence is clear that while in Bonner County Jail, Deborah was in a cell designed for *adult prisoners.* The cell had no outside windows and while in the cell, Deborah could only view a wall on the opposite side of a hallway running past her cell, said view occurring through a small opening in the cell door. (The Court granted a jury view of the cell area during the course of the trial.)

"Deborah testified during the trial that when she was taken into custody on March 13th, 1980, *she underwent a strip search, shower and delousing. She had all of her clothes taken away from her, including her underwear* and was given only jail coveralls to wear.

"Deborah had no reading material, radio or TV and *none was furnished to her by the Department of Health and Welfare during her stay in the jail cell.*

"The two adjacent cells contained other minors, Tina Dunson and Brian Pitts. Two other adjacent cells contained adult offenders, Jesse Scroggie, charged with first degree murder, and Richard Hendrickson, charged with aggravated assault with a knife (Plaintiff's Exhibit #1) and two charges of rape, one occurring in Bonner County and one in Boundary County. (Hendrickson later plead guilty to one count of rape and was sentenced to prison.)

"Deborah testified that Hendrickson talked *"sex talk"* to her through his cell door opening.

*"No one from the Department of Health and Welfare visited Deborah in her jail cell.* Koski visited Deborah in a police officers room on March 13th and again on March 19th, but never in the jail cell.

*"Koski testified* that he did not know the rules and regulations for a detention facility, but *that he did not consider the Bonner County Jail as a shelter home,* although he admits that he had previously placed another juvenile in detention in the Bonner County Jail.

"On March 25th, 1980, *Koski filed a 'Report of Investigation'* with the Magistrate's Court *recommending* legal custody be vested in the Department of Health and Welfare for one year, and since it was impossible to place Debbie immediately, *that she 'remain in detention until she can be placed in a treatment facility ...'.* (Plaintiff's Exhibit # 3).

"On March 25, 1980, the Magistrate ordered Deborah detained '... *in the custody of the Bonner County Sheriff'* pursuant to *Rule 17* of the Idaho Juvenile Rules.

"Finally, *on March 26th, 1980,* the Magistrate held a detention hearing and thereafter provided that the legal custody of Deborah Merritt *was committed to the Idaho Department of Health and Welfare* for one year and:

*'IT IS HEREBY ORDERED that said child be placed in the Department of Health and Welfare Regional Center, Wallace, Idaho, pending placement by the Department of Health and Welfare. Transportation to said Regional Center to be provided by the Bonner County Sheriff's Office.'*

"The Sheriff was to transport Deborah to Wallace.

"Deborah, nevertheless, remained in the Bonner County Jail until March 31st, 1980.

"From the evidence presented to the jury, it would be easy for the jury to conclude that Deborah Merritt, a twelve year old child, was placed in an adult jail cell, in virtual isolation, from March 13th until March 31st without adequate exercise, visits or counseling, and without being furnished reading material, radio or television, or even sufficient toilet articles such as a toothbrush or comb, such confinement occurring with the knowledge and at the request of the Idaho Department of Health and Welfare.

The jury was instructed on juvenile detention facilities as set forth in *Idaho Code 16–1812* and *16–1812(a)* as follows:

*'Instruction No. 17*

*YOU ARE INSTRUCTED that under Idaho law, a county jail facility must provide for the following standards if used for the temporary detention of children:*

* *1.) Juvenile detention facilities must be so constructed and/or maintained as to keep children segregated from adult offenders or those being treated as adult offenders, with there to be no contact as to sight and/or sound between the two (2) classes.*

* *2.) Juvenile detention facilities must provide supervision and observation of juvenile dettainees sufficient to protect the physical and mental health of the detainees.*

*3.) Juveniles held in detention must be provided with at least three (3) adequate and nutritional meals per day.*

* *4.) Juveniles held in detention must have access to reading materials on a regular and systematic basis. Detained juveniles may receive books, newspapers and periodicals from any source including delivery to the detention facilities by family members, subject to the right of detention authorities to inspect and remove dangerous or harmful materials. Deten-*

*tion authorities may forbid the introduction into holding quarters of obscene books or periodicals.*

*5.) A visiting program shall be established in juvenile detention facilities which will allow for family visits to each juvenile for at least two (2) hours each week.'*

"It was Koski's position that the Idaho Department of Health and Welfare only acted as a courtesy in supervising Deborah and that the custody of Deborah was, in fact, with the Court. *Koski thought* that the Department of Health and Welfare did not, in fact, have custody of Deborah until the hearing on March 26th and even then the Sheriff's Department and not the Department of Health and Welfare was ordered to transport Deborah to Wallace. *Koski understood that Deborah was to be transported on March 26th, but he did not call or check with the Sheriff's Office to determine if such transportation had, in fact, occurred.*

"During the evening of March 26th, after the Court hearing, Deborah was in her jail cell when her toilet overflowed.

"The jailer, Mario Avella, opened Deborah's cell door, gave her a mop and a pail with instructions to clean up the results of the overflowed toilet, at which time the jailer left the cell area without further supervising Deborah.

"In the process of walking up and down the jail corridor, Deborah approached the cell of Hendrickson when he called to her and asked her if she wanted a cigarette. According to Deborah, as she approached the opening of the cell door, Hendrickson grabbed the collar of her coveralls with one arm, forcing his other arm inside of her coveralls where he fondled her. Deborah testified the only injury she received was a small scratch and that the incident occurred for two to three minutes.

"Deborah testified that she was very nervous and upset over the incident but did not report the same until March 27th when she informed Deputy Sheriff Biggerstaff as to what had occurred.

. . . .

*"Bonner County Jailer, Charles Fulton,* testified that the Bonner County Jail is not a satisfactory juvenile detention facility because children placed there can not be separated by sight and sound from adult prisoners. In addition, it is the jailer's position *that the Department of Health and Welfare can remove a child from jail detention at any time.*

R., Vol. 4, pp. 194–200 (emphasis added) (* added).

Based on these facts, eleven of the twelve jurors answered "yes" to the question: "Was there negligence on the part of the Defendant, State of Idaho, Department of Health & Welfare, which was a proximate cause of the damages complained of by Plaintiffs?"

The district court provided the Department with a judicial review as to the sufficiency of the evidence to support that verdict:

There is substantial, competent evidence to support the verdict of the jury against the State of Idaho to the effect that *the Department* of Health and Welfare *was negligent in not taking steps to seek to detain Deborah in a facility other than the Bonner County Jail,* which negligence caused the juvenile to be sexually molested causing her physical and mental pain and suffering.

The Department of Health and Welfare initiated the Child Protective Act proceedings involving Deborah. Koski had full knowledge that Deborah was being wrongfully detained in an adult jail cell and not in a juvenile detention facility. The Court order of March 10th, 1980, required that Deborah be placed in *"the juvenile detention facility at the Bonner County Jail or the most accessible jail or detention facility available . . ."*.

On March 25th, 1980, when Koski filed his *"Report of Investigation"* he knew that Deborah was being detained in an adult jail facility and nevertheless recommended to the Court that she *"remain in detention until she can be placed in a treatment facility . . ."*
(Emphasis added.)

A cursory review of the record discloses that the district court was on sound ground in upholding the challenge to the jury verdict. It is absurd to excuse the Department's negligence for causing, and then condoning, the incarceration of Deborah in a jail which was wholly not in compliance with statutory requirements. It was a prima facie violation of civil rights. Although the Department may have confused three members of this Court by loose language as to custody being in the court and not in the Department, the district court with 100 percent accuracy related that after the magistrate court ordered Deborah to be placed in "a place of shelter" by the Department, and after the Department so placed her on March 7th, the court notified her father that a hearing would be held on March 10, 1980, *"to determine whether custody of Deborah should remain in the Department."* The order of March 10th, incorporated into the majority opinion, corroborates that conclusion in the fullest: "If Deborah Merritt shall . . . *without prior authority and authorization from the Department . . . ."* Obvious to the "nth" degree, Deborah was not a free agent, and the Department had custody of her—which in anyone's book is legal custody—of which authority over is the primary element. The order went on to empower any peace officer to take her into "custody," which in the parlance of the law enforcement profession, equates to "pick her up"—the very language of the majority opinion. If an adult were involved, more properly such taking of custody would be an arrest—but that is a word not to be used in the juvenile world. Be all that as it may, the picking-up of Deborah was a matter of *physical* custody, not *legal* custody, and the purpose of the order providing for physical custody was to avoid a frustration of the court's jurisdiction and the Department's exercise of legal custody. It was the Department's Mr. Koski who, on finding Deborah at a motel, caused the police to pick her up. Of all that there can be no doubt whatever—

as there can be no doubt as to the accuracy of the district court's opinion upholding the jury's verdict finding the Department at fault.

The Department, however, choosing to ignore the facts, urged upon the district court that "the record unequivocally shows that the Department ... was not the legal custodian of [Deborah] as of the date of ... March 14, 1980 .... Pursuant to Idaho Code 16–603, [Deborah] was *within the custody of the Court,* which was authorized to enter orders in the best interests of the child." (Emphasis added.) This argument was on the frivolous side. I.C. § 16–603 vests the court with *jurisdiction.* The only mention of custody or custodian therein is where the section speaks in terms of a child's parents, guardian, or other legal custodian. I.C. § 16–604 also deals with jurisdiction. At any rate, the Department did not succeed in befuddling the district court—which readily and correctly saw that there was evidence from which the jury could find, as it did, that the Department had obtained court orders by which it supplanted Deborah's father's prior legal custody, and that the Department was responsible for Deborah's incarceration in a jail occupied by an accused murderer and a twice-accused rapist. Worse yet, the jail did not even come close to complying with the statutory requirements for detention facilities. Although Koski could not be confronted with having seen Deborah's windowless cell, he would have been hardpressed to testify that he did not find her clothed in jailhouse striped coveralls.

When the Department prevailed at the March 26 hearing, and obtained Deborah's legal custody for a full year, there was no reason whatever for not forthwith taking Deborah, the Department's ward with whom it occupied a status of *loco parentis,* out of the Bonner County jail. Had it lived up to its responsibility, she would not have undergone the assault to which she was later that same day subjected. As the district court's order pointed out, however, she was left in that horrible environment for an additional five days after she was *fully* committed to the Department's care and custody.

In that connection it is important to note that the district court's statement that "The Sheriff was to transport Deborah to Wallace," was wholly based on the magistrate's order signed two days later on the 28th, which actually did not so order, but rather reads only that "Transportation to said Regional Center to be provided by the Bonner County Sheriff's Office." This is a far cry from amounting to an order committing Deborah to the custody of the Sheriff for transportation to Wallace. Deborah was never ordered into the custody of the Sheriff. At best the language in the magistrate's order of March 28 was a direction to furnish the Department with transportation so that Deborah could be moved out of the Bonner County jail to the Department of Health's Regional Center—*where she could have and should have been detained* in the first place—unless the Department arranged for suitable detention facilities in Sandpoint. And, in passing, it is strange indeed that any utilization of a sheriff's vehicle would be made where the Department has its own vehicles, any of which could as readily make the one and one-half hour drive from Sandpoint to Wallace.

The trial court's inadvertence in saying that the Sheriff was to transport Deborah obviously flowed from the language of the magistrate's order as further affected by the district judge's observation in his order that "Koski thought that ... the Sheriff's Department and not the Department of Health and Welfare was ordered to transport Deborah to Wallace." While Koski did testify along that line, the fact remains that in the afternoon of the 26th, in open court, and prior to the assault which would take place upon Deborah later on, the magistrate ruled that the Department's custody of Deborah was extended for one year. Far more important to the jury than the written order which was signed by the magistrate, *after* the assault on Deborah, was the order handed down by the magistrate at the conclusion of the short hearing

early on the afternoon of March 26. The jury was allowed to hear a tape of the proceedings in magistrate court—a transcription of which is readily available in the reporter's transcript:

> THE COURT: Ladies and gentlemen, I will make a statement here and counsel can correct me if I misstate what we are going to do.
>
> We have the recording device that the Magistrate Court uses. And on that is a reel, magnetic tape we are going to play.
>
> The tape is a portion of the hearing held before Magistrate Hardy C. Lyons, on March 26. You have already heard the testimony about the Court Order entered by Magistrate Lyons, dated March 28, pertaining to the hearing on March 26. But these are the actual words said in court at that time.
>
> Now, I think the tape starts out with Magistrate Lyons making a statement. I think you will hear in the background a statement made, also, by Gary Finney, the Prosecuting Attorney for Bonner County.
>
> Anyone else? Perhaps, just those two people.
>
> . . . .
>
> (Tape Recording) "If there is nothing further, I will make a finding that Debbie is within the purview of the Child Protective Act, and I will place her with the Department of Health and Welfare for the interim period. I think, probably, that her wishes to be in a group home will be accorded some weight with the Department of Health and Welfare. Is there anything further?
>
> MR. FINNEY: Only she be detained in a shelter care situation by Bonner County at the Wallace Regional Facility at Wallace, Idaho pending her acceptance or placement by the State of Idaho. Sounds like the testimony would be about two weeks until she be placed in either of these facilities.
>
> MR. LYONS: I think that is true. Be more around April 10; is that correct?
>
> MR. FINNEY: Yes.

> MR. LYONS: And she will be detained at the Regional or District Detention Facility pending anything further."

Tr., Vol. 2, pp. 424–26.

These statements of Magistrate Lyons and Mr. Finney (prosecuting attorney then representing the Department) were played a second time for the benefit of the jury. The magistrate was succinct and to the point; the order made in open court, on the record, was dispositive. *If* the Department *truly* believed at that time that it needed a written order to pack Deborah's sparse belongings and head for Wallace, any practicing attorney and any secretary will agree that it would have taken three to five minutes to sit down at any of thirty or more typewriters in the Bonner County courthouse and type up the order embodying the magistrate's decision. Department personnel, *if imbued with any sense of responsibility* for "the best interests" of a twelve-year-old girl locked up in a jail under the circumstances here known to the Department, could and should have been immediately on the road to Wallace. Instead, as the jury would learn, they left her in the jail *for another five days.*

The written order, which the Department after the fact would contend was an absolute prerequisite to removing Deborah from that jailhouse, filed and dated March 28, was *virtually* identical to that which the jury heard ordered via the tape. Eleven lines long, other than for a caption and six lines of recital, it reads:

> Now therefore, upon the testimony and documents on file in the above-entitled matter, it is the finding of the Court that Deborah Merritt, the above-stated child, is within the jurisdiction of the Court and within the purview of the child protective act.
>
> IT IS HEREBY ORDERED that legal custody of Deborah Merritt is committed to the Idaho Department of Health and Welfare for an indeterminate period not to exceed one (1) year from entry of this order.
>
> IT IS FURTHER ORDERED that said child be placed in the Department of

Health and Welfare Regional Center, Wallace, Idaho, pending placement by the Department of Health and Welfare. Transportation to said Regional Center to be provided by the Bonner County Sheriff's Office.

Plaintiff's Ex. 3.

Virtually the same, I say, because the final sentence suggesting that the sheriff's office should provide a vehicle was not spoken by the magistrate, or spoken by counsel representing the Department and agreed to by the magistrate, or spoken by anyone.

Of course, by the time this order, which was drawn by a deputy prosecuting attorney who had *not* participated as assistant counsel in the magistrate court proceedings, was prepared and submitted to the magistrate for signature, Deborah had already been assaulted—which may serve to suggest that someone had suggested to the deputy prosecuting attorney the alteration accomplished by the final sentence: "Transportation to said Regional Center to be provided by the Bonner County Sheriff's Office." And, as discussed *infra*, the deputy prosecuting attorney was not at Deborah's hearing, and he may not have known that the proceeding was under the Child Protective Act. Deborah's testimony was that on the day after the assault, she related it to a Mr. Biggerstaff in "a small room downstairs, Detective's Staff Room, I believe." This was one day before the order was submitted for the magistrate's signature. The jury well may have concluded that they were seeing a Watergate type of coverup—where the delayed written order encompassed language not spoken by the magistrate. That the magistrate signed it with the final sentence added means nothing. The magistrate at a glance at the first few lines would see what appeared to be the reproduction of the words which he had uttered.

*Had* Deborah been involved in some serious criminal activity, and *had* she been charged under the provisions of the Youth Rehabilitation Act, and *had* she been committed to the State Department of Health and Welfare for placement at St. Anthony, or some other institution housing incorrigible juveniles, I.C. § 16–1836 does contain language authorizing the court to appoint the sheriff, or his assistant, or Y.R.A. counselor or probation officer, to physically transfer the juvenile offender to the place designated by the Department. Similar language in I.C. § 16–1814 speaks in language of only the sheriff being so appointed, with the right in the sheriff to delegate the responsibility. This is all understandable, because the Y.R.A. is premised on recognition that there are unfortunately some able-bodied, street-wise juvenile criminals who can be very violent and very dangerous. But, that is a provision under the Y.R.A., and *here we deal with a twelve-year-old girl not charged with any crime, but whose neglected status has brought her within the purview of the Child Protective Act*, under action taken by the Department. The jurisdiction of the courts under this Act, whereby the Department becomes substituted as legal custodian and guardian, replacing even natural parents, arises not because of any criminal activity, but because of the child being abandoned, abused, or neglected—in short, seriously in need of help. In Mr. Koski's affidavit initiating the proceedings in magistrate court said: "It is this worker's belief based on knowledge of this child's emotional state and maturity level, that *she is incapable of caring for herself and there is no one taking the responsibility for her.*" (Emphasis added.)

Now, the question arises, was this a child who should have been transported by a uniformed deputy in a patrol car? Not unless she was a criminal who would have been prosecuted as an adult except for her age bringing her within the purview of the Y.R.A. Transportation of Deborah, a neglected child, as a criminal in and of itself was improper, although not so damaging as incarcerating her in an adult jail as a common criminal where she was dehumanized by a strip search—which to the minds of the jurors may have been viewed as equally damaging as the assault made

upon her by a male prisoner.[1] Not only was there no need to insert in the order of March 28 the bit about the sheriff providing transportation, but my rather thorough reading of the Child Protective Act fails to disclose any provision bringing the sheriff into the act of transporting a child within the purview of the Child Protective Act. My own recollection is that of friendly and responsible, motherly and fatherly Department caseworkers performing that function. These same powers of recollection also serve to remind me that caseworkers either have, or have access to, Health & Welfare vehicles, and if not, that they are reimbursed for mileage where their privately-owned vehicles are used in Health & Welfare business.

### ADDENDUM

Since writing the foregoing, on taking a second look at the majority opinion and comparing it to the record, further comment is required, although time constraints preclude a thorough development of the shortcomings and misstatements of the majority opinion. The testimony of the prosecuting attorney, the Department's attorney at the hearings of March 14 and March 26, is relied on for the proposition advanced by the majority, in defense of the Department, that: "It appears from the evidence adduced at trial that the Bonner County Sheriff's Office was the only agency that transported juveniles between detention centers." The prosecutor did give testimony along that line—but cross-examination made a severe inroad upon the same. The question was asked: "When you are using the word, 'detention' are you using that in the contents [sic, context] of the Youth Rehabilitation Act?" The answer, a somewhat evasive and noncommital answer: "If you look at the book 16–1801 as a definition section, it has the word detention and definition." The prosecutor also admitted being familiar with 16–1836. I.C. §§ 16–1801 and –1836 are both part of the Y.R.A. Detention is not defined in the Child Protective Act, but in the Y.R.A. it is defined: "j. 'Detention' means the temporary care of *children who require secure* custody for their own or the community's protection in physically restricting facilities pending court disposition." More could be said on this proposition, but should not be necessary. The jury had before it as plaintiff's Exhibit 3 the complete juvenile court file, Case No. 18420 CPA, In the Interest of Deborah Merritt. Shortly after Deborah was moved to Wallace, and long before this litigation commenced, the deputy prosecutor on April 4, 1980, prepared and submitted this motion and supporting affidavit:

---

1. Admitted as Defendant's Exhibit II, the Bonner County Sheriff's Department Jail Policy Booking Procedures provide as follows:

   6. The Prisoner is then taken into the jail and strip searched. Have him remove all of his clothing, including underwear and socks. His entire body is checked for weapons, drugs, and other contraband at this time.
   a. If the prisoner is a female, the jailer will have a matron do the strip search; however, the jailer will remain within earshot in case of emergency, to render assistance if needed.
   . . . .
   The strip search of a prisoner should be thorough and systematic. Injuries and identifying marks such as scars, birthmarks, and tattoos should be noted and recorded. The search should begin with the prisoner's head; run your fingers through his hair. Look inside the ears, the mouth, under the tongue, in the nose. Have the prisoner raise his arms so that the armpits may be examined. Check his hands and fingers. Check the pubic area by having him lift first his penis, and then his testicles. Then have him face away from you, bend over and spread his buttocks so you can see the rectum. Have him cough two or three times and anything placed in the rectum will then pop out. Have his raise his feet so you can see the soles; look between his toes. Had the child prisoner, Deborah, been of the age of 8, 10, or 14 years, there is no reason to believe that the Department personnel would have been any less indifferent to the outrages which their ward was being subjected.

MOTION

The Idaho Department of Health and Welfare moves this Court to enter an order authorizing removal from detention at Wallace, Idaho the above-named child, whose custody has been vested with the Department by order of this court dated March 26, 1980.

_April 4, 1980_
Date

_Philip H. Robinson_
Attorney

STATE OF IDAHO    )
                  )          AFFIDAVIT
County of Bonner  )

_____Allan R. Koski_____, being first duly sworn, states:

1. That he is a duly appointed Caseworker for the Department of Health and Welfare, and has personal knowledge of the facts contained in this affidavit.

2. Deborah Merritt is scheduled to be placed at North Idaho Children's Home on April 7th, 1980. It would be in her best interests to be released from detention so she can be transported by the Department of Health and Welfare to this facility.

_4/4/80_
Date

_Allan Koski_
Affiant

SUBSCRIBED AND SWORN to before me this __4th__ day of _____April_____, 1980.

_____
Notary Public, State of Idaho
Residing at:

The jury was thus at liberty to not accept the intimations of the prosecutor that the sheriff's office was always used to transport homeless children who were taken under the protective wing of the Department as provided by the Child Protective Act.

Commendably, the majority does note that:

"Respondent [Deborah] contends that the State of Idaho, Department of Health & Welfare, owed Deborah a duty of reasonable care and that it breached that duty when it allowed her to be confined in an inappropriate detention facility."

Although misconstruing that Deborah's father is the plaintiff—not the case at all—that the contention made is "that the Department, thereafter, breached its duty to Deborah by allowing her to be detained in the Bonner County Jail." Having done fairly well, but mistakenly viewing Walter Merritt as the plaintiff, the majority makes the remarkable statement that: "he consented to Deborah being held in the Bonner County Jail pending an adjudicatory hearing to determine who should have legal custody of her." Walter Merritt's consent was of no legal consequence, nor was it material. It was Walter Merritt's inade-

quacies which caused the Department to take custody of Deborah because she was neglected and homeless. Worse, though, is the majority's continuation of the base canard that the adjudicatory hearing was to determine who should have legal custody of Deborah. As the district judge noted, legal custody had been taken, and the first hearing was to ascertain if legal custody *"should remain"* with the Department until the adjudicatory hearing. The purpose of the adjudicatory hearing was to ascertain if the legal custody in the Department would be extended "for an indeterminate period of time not to exceed one year," as recommended by the Department through Mr. Koski. An equally base canard is the self-justifying majority statement that "Deborah was jailed under a contempt order". If the majority would read its own opinion, the magistrate, properly attempting to exert a show of muscle on the 12-year-old girl, *threatened* her with contempt. She was never held in contempt—which would have been both futile and foolish. Where do you jail a 12-year-old who is held in contempt? Not in jail. Not in the Bonner County jail. And, would it be civil or criminal contempt?

Leaving to others the task of further documentation of the majority opinion shortcomings and misstatements, there are two points which should be mentioned. The magistrate who selected the Bonner County jail as a proper detention facility for Deborah was not a resident of Bonner County, but of Kootenai County. Why the magistrate would think that a Bonner County jail is better than a Kootenai County jail is open to speculation. Especially is this so where the magistrate had to know that a United States District Judge, a few years ago, either closed down the Kootenai County jail, or threatened to, because it was not even fit for adult prisoners accused of crime. But, there were those who knew that there were no proper qualified detention facilities in the Bonner County jail, and some of those would include the Department's workers stationed in Sandpoint, and would also include the Department's legal representative.

In the same court-house building, where Deborah was so inhumanly incarcerated in violation of her civil rights there was at all times a resident district judge—in fact the same judge who presided at the trial. It would have taken little effort, and *no* expenditure of money, for the Department to have laid before the district judge a petition for a writ of habeas corpus under the provisions of I.C. §§ 9–4201 and 9–4215. I do not believe that any member of this Court would venture to deny that the confinement was unlawful, or that the writ would have issued. Or, the illegal incarceration ordered by the magistrate could have been challenged on a writ of review. The Department, if truly concerned that its charge was wrongfully jailed, had options readily available—other than doing nothing.

Not only does the Court this day offend the jury system and the district judge who presided over the case, but also another district judge who earlier denied the Department's motion for summary judgment:

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF BONNER

WALTER MERRITT, Guardian and Litem, for DEBORAH ANN MERRITT, a minor, Plaintiff,

vs.

RICHARD D. HENDRICKSON, BONNER COUNTY, State of Idaho, and STATE OF IDAHO, Defendants.

CASE NO. 20110

ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Defendant State of Idaho has moved for Summary Judgment, and the Court is of the opinion that said motion must be denied.

Plaintiff Deborah Ann Merritt was born August 2, 1967, and the events herein concerned occurred on or about March 28,

1980. At that time, Plaintiff was an inmate of the Bonner County jail.

Defendant State of Idaho's liability is set forth in Count Five of the Complaint. Therein, it is alleged that in March of 1980, the Idaho State Department of Health and Welfare petitioned the Bonner County court under the Child Protective Act for the legal custody of the Plaintiff, then on March 26, 1980, the magistrate granted custody to the said department and the employees of the department while acting within the course and scope of their employment and, in the performance of their duties, negligently permitted and encouraged the confinement of the Plaintiff in the Bonner County jail, and, as a result, said Plaintiff came in contact through both sight and sound with the Defendant Hendrickson (another inmate) and with the adult prisoners of the Bonner County jail.

It is further alleged that Hendrickson offensively and harmfully touched the person of the Plaintiff which was intentional and thereby caused her damage.

The State argues that, as a matter of law, it could not be held liable under the Idaho Tort Claims Act on two grounds, both of which involve Idaho Code Section 6–904.

"A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

\* \* \* \* \* \*

4. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abusive process, libel, slander, misrepresentation, deceit, or interference with contract rights."

The State's contentions are two-fold. That is, that the claim falls within the "discretionary function" exemption and "arises out of battery."

## DISCRETIONARY FUNCTION

While there are a plethora of cases from both the federal and state courts attempting to interpret the language of the discretionary function or duty section of the Tort Claims Act, it would appear that the Idaho cases would not grant the government an exemption under the facts of the case at bar.

"It was only after the briefing and argument of the case at bar that this Court issued its opinion in *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21 (1979) wherein the "discretionary function or duty" language of I.C. Section 6–904(1) was at issue. Dunbar was an action by the survivors of miners killed in a fire in a mine. That action was brought in part against the State on the theory that the State and its officials had negligently conducted mine inspection programs. In Dunbar we noted that that action was essentially concerned with the abilities of officials, the enactment of regulations, and the alleged lack of enforcement of statutes, regulations and standards. We further noted that such governmental activities having to do with the enforcement of standards and regulations had no parallel in the private sector. Therein Smith was distinguished on the basis that the actions of the State in Smith (and in the case at bar) do have a parallel to the private sector and can be analogized to a landowner's failure to warn of known dangerous conditions on his property.

If a private person or business negligently allowed a dangerous condition to exist in a stairway or elevator and thereby cause injury, we would find the breach of a duty. No less so should we find a breach of a duty on the part of the state or a county which negligently maintained

a dangerous condition on a stairway or elevator of a statehouse, courthouse, or other government operated building. We see no distinction between those situations and the negligent maintenance of a known dangerous condition of a highway, owned, operated and maintained by the State and upon which the public is invited to travel. Thus, unlike Dunbar, the State's action in the case at bar has a parallel in the private sector, and the State, under the Idaho Tort Claims Act, bears the same duty as does a private landholder. Hence, we hold that the State's alleged negligence is not immunized by the "discretionary function or duty" exception to governmental liability found in I.C. Section 6–904(1)."

Gavica v. Hanson, 101 Idaho 58, 608 P.2d 861 (1980).

It is this Court's opinion that the department's action in taking custody of the Plaintiff, albeit through court proceedings, has a parallel in the private sector and that the department, under these circumstances, would be bound to exercise ordinary care as custodian of said minor.

This Court has some reservations about the ultimate effect of Gavica in possibly expanding governmental liability beyond that which the legislature intended, but if the State is liable where the Department of Highways fails to place warning signs on a public highway, then the Department of Health and Welfare likewise could be subjected to possible liability if it failed to exercise ordinary care under the facts in this case. These questions, of course, are matters for the trier of the fact to determine.

There being a disputed issue of fact material to the outcome of this case concerning the possible negligence of the State, the Motion for Summary Judgment must be denied on the foregoing ground.

### ARISES OUT OF BATTERY

It should be noted here that the battery, if any, was committed by the Defendant Hendrickson while an inmate of the Bonner County jail. Plaintiff's Complaint is founded on the negligence of the State in placing the Plaintiff in a situation where such could occur and which could have been reasonably foreseen by the State.

There are no Idaho cases that reach the question of the applicability of this exemption where the battery was committed by a non-employee of the government.

However, all of the Federal Circuit Court decisions that have ruled on that issue have held that the assault-battery exception does not extend to an assault and battery committed by a person who is not in the employ of the government or an agent thereof.

Gibson v. United States, 457 F.2d 1391

Rogers v. United States, 397 F.2d 12

Underwood v. United States, 356 F.2d 92

Muniz v. United States, 305 F.2d 285

Panella v. United States, 216 F.2d 622

Under these circumstances, the Circuit Court's interpretations of this provision would be highly persuasive, and, hence, the Motion for Summary Judgment must be denied on this ground.

BE IT SO ORDERED.

DATED this 22nd day of June 1982.

/s/ James G. Towles
District Judge

HUNTLEY, J., concurs.