ANNE FUCHILLA, RESPONDENT, v. WILLIAM A. LAYMAN, M.D.;
UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JER-
SEY AND THE BOARD OF TRUSTEES OF THE UNIVERSITY
OF MEDICINE AND DENTISTRY OF NEW JERSEY, APPEL-
LANTS.

Argued March 30, 1987—Decided February 8, 1988.

*Barbara A. Harned,* Deputy Atty. Gen., argued the cause for appellants (*W. Cary Edwards,* Atty. Gen. of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Atty. Gen., of counsel).

*Maureen S. Binetti* argued the cause for respondent (*Wilentz, Goldman, & Spitzer,* attorneys; *James M. Burns,* of counsel and on the brief).

The opinion of the Court was delivered by

POLLOCK, Justice.

This appeal concerns the applicability of the notice provisions of the Tort Claims Act (the Act), *N.J.S.A.* 59:8–8, 9, to discrimination claims brought pursuant to the Civil Rights Act, 42 *U.S.C.A.* § 1983 (section 1983), and the New Jersey Law Against Discrimination (the Law), *N.J.S.A.* 10:5–1 to –42. Plaintiff, Anne Fuchilla, sued under both statutes, and the University of Medicine and Dentistry of New Jersey and its Board of Trustees (UMDNJ) moved to dismiss the complaint because of her failure to satisfy the notice provisions of the Act. The Law Division granted summary judgment in favor of UMDNJ, and the Appel-

late Division reversed and remanded, 210 *N.J.Super.* 574. We granted certification, 105 *N.J.* 563 (1986), and now affirm the judgment of the Appellate Division.

We hold that UMDNJ is a "person" within the meaning of section 1983 and, therefore, may be liable for Civil Rights violations under that statute. We hold further that sexual harassment does not constitute an "injury" within the meaning of the Act. Consistent with that conclusion, the notice provisions of the Act, *N.J.S.A.* 59:8-8, 9, do not apply either to injuries arising from violations of the Law or to a violation of federal rights protected by section 1983. Consequently, Fuchilla may maintain her causes of action under section 1983 and under the Law.

–I–

This matter is presented on UMDNJ's motion for summary judgment. Consequently, we assume that the facts as alleged by Fuchilla are true, and give her the benefit of all inferences that may be drawn in her favor. *R.* 4:46–2; *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 65 (1980). Because the matter is presented on review of an order for summary judgment, our decision does not reflect any view of the appropriate disposition at trial.

Fuchilla was employed as a secretary at UMDNJ from January 1965 until June 1983, when UMDNJ terminated her employment. For most of the period of her employment, she was assigned to Dr. William A. Layman, but in July 1982, she began working for Dr. Darwin Prockop. While they were working together, Fuchilla and Dr. Layman engaged in an intimate relationship, which lasted until 1981. Between that date and the date of her transfer to Dr. Prockop, Fuchilla alleges that "Layman sexually harassed and intimidated plaintiff in the performance of her job functions and responsibilities, and retaliated against her for having terminated their intimate relations." She contends that the alleged acts of discrimination

began on November 3, 1981, and lasted until either August or November of 1982.

On September 3, 1982, while still employed by UMDNJ, Fuchilla instituted this action against UMDNJ, its trustees, and Dr. Layman. Insofar as UMDNJ is concerned, Fuchilla alleges that "[d]efendant UMDNJ has supported Layman in his continual sexual harassment actions and has failed to take any action or remedy to stop the discriminatory acts of defendant Layman." She claims that in November 1982 Dr. Prockop asked her to resign and that in June 1983 UMDNJ fired her. Fuchilla settled her claim against Dr. Layman for $25,000, and on August 4, 1983, she filed a notice of claim with UMDNJ. She filed the notice, however, beyond the ninety-day period permitted by the Act, *N.J.S.A.* 59:8-8, 9, and the Law Division granted UMDNJ's motion to dismiss her complaint. In reversing, the Appellate Division ruled that the notice provisions of the Act did not apply to Fuchilla's claims under either the Law or 42 *U.S.C.A.* section 1983. The court also ruled that Fuchilla's claim for injunctive relief was not subject to the provisions of the Act, a ruling that UMDNJ does not challenge on this appeal.

During the pendency of this action, Fuchilla instituted a suit in the United States District Court for the District of New Jersey against Dr. Prockop and UMDNJ, *Fuchilla v. Prockop*, No. 85–0693 (D.N.J. Oct. 13, 1987). That court granted summary judgment dismissing the complete complaint against Prockop and granting partial summary judgment on Fuchilla's claims against UMDNJ based on substantive due process and equal protection, but not on her claims based on her free speech and liberty rights under the fourteenth amendment to the United States Constitution. The effect of that judgment on this action is not before us.

–II–

■ To be liable under 42 *U.S.C.A.* section 1983,[1] the defendant must be a "person" within the meaning of that section. The statute does not define "person," and in defining the term, the United States Supreme Court has looked to the eleventh amendment,[2] under which the individual states are not subject to the jurisdiction of the federal courts. *Quern v. Jordan,* 440 *U.S.* 332, 350–51, 99 *S.Ct.* 1139, 1150, 59 *L.Ed.*2d 358, 373 (1979) (Brennan, J., concurring). In *Quern v. Jordan,* according to Justice Brennan's concurring opinion, the Supreme Court impliedly held that a state is not a "person" within the meaning of section 1983. *Id.* at 350, 99 *S.Ct.* at 1150, 59 *L.Ed.*2d at 372; *Bailey v. Ohio,* 487 *F.Supp.* 601, 603 (S.D.Ohio 1980) ("[t]he fact that Congress did not intend to abrogate eleventh amendment immunity for the states means, necessarily, that a state is not a 'person' under § 1983 and no suit for any relief may be maintained against the state under § 1983"). Following that interpretation, a majority of state courts have held that an entity considered to be a state or its alter ego for eleventh amendment purposes is not a "person" under section 1983. *See State v. Green,* 633 *P.*2d 1381 (Alaska 1981); *Pyne v. Meese,* 172 *Cal.App.*3d 392, 218 *Cal.Rptr.* 87 (1985); *Merritt for Merritt v. State,* 108 *Idaho* 20, 696 *P.*2d 871 (1985); *Hampton v. Michigan,* 144 *Mich.App.* 794, 377 *N.W.*2d 920 (1985); *DeVargas v. State ex rel. N.M. Dep't of Corrections,* 97 *N.M.* 447, 640 *P.*2d 1327 (Ct.App.1981), *cert. quashed,*

---

[1] Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[2] The eleventh amendment of the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

97 *N.M.* 563, 642 *P.*2d 166 (1982); *Edgar v. State,* 92 *Wash.*2d 217, 595 *P.*2d 534 (1979), *cert. denied,* 444 *U.S.* 1077, 100 *S.Ct.* 1026, 62 *L.Ed.*2d 760 (1980); *Boldt v. State,* 101 *Wis.*2d 566, 305 *N.W.*2d 133, *cert. denied,* 454 *U.S.* 973, 102 *S.Ct.* 524, 70 *L.Ed.*2d 393 (1981); *but see Gumbhir v. Kansas State Bd. of Pharmacy,* 231 *Kan.* 507, 646 *P.*2d 1078 (1982), *cert. denied,* 459 *U.S.* 1103, 103 *S.Ct.* 724, 74 *L.Ed.*2d 950 (1983); *Lowery v. Department of Corrections,* 146 *Mich.App.* 342, 380 *N.W.*2d 99 (1985); *Ramah Navajo School Bd. v. Bureau of Revenue,* 104 *N.M.* 302, 720 *P.*2d 1243 (Ct.App.), *cert. quashed,* 104 *N.M.* 201, 718 *P.*2d 1349, *cert. denied,* —— *U.S.* ——, 107 *S.Ct.* 423, 93 *L.Ed.*2d 373 (1986). In the ten years that have elapsed since *Quern v. Jordan, supra,* the United States Supreme Court has not rejected Justice Brennan's interpretation. Furthermore, the parties rely upon that interpretation in the present case. In sum, if a governmental entity enjoys immunity as the state or its alter ego under the eleventh amendment, it cannot be liable as a "person" under section 1983. *See Kovats v. Rutgers,* 633 *F.Supp.* 1469, 1477 (D.N.J.1986). Otherwise, section 1983, in effect, would abrogate the eleventh amendment. If, however, a governmental entity is not considered to be the "state" for eleventh amendment purposes, it is not immune from federal court jurisdiction, and a federal action may be maintained against it as a "person" under section 1983.

In the federal courts, a section 1983 action is subject to constraints not present in state courts. For example, the eleventh amendment limits the jurisdiction of federal, but not state, courts. *Maine v. Thibotout,* 448 *U.S.* 1, 9 n. 7, 100 *S.Ct.* 2502, 2507 n. 7, 65 *L.Ed.*2d 555, 562 n. 7 (1980), One effect of the eleventh amendment is to subject a state in a federal court to prospective injunctive relief, but not to a claim for damages. *Edelman v. Jordan,* 415 *U.S.* 651, 94 *S.Ct.* 1347, 39 *L.Ed.*2d 662 (1974); *Ex Parte Young,* 209 *U.S.* 123, 28 *S.Ct.* 441, 52 *L.Ed.* 714 (1908). Because the present matter is pending in a state court, we are not concerned with eleventh amendment immunity as a defense or with the direct effect of that amend-

ment on the proceedings. The determination whether UMDNJ may be considered to be the State under the eleventh amendment, however, is necessary to determine whether UMDNJ is a "person" within the meaning of section 1983. In urging us not to remand the matter but to resolve that issue, the Attorney General has supplemented the record with part of the appropriations handbook for fiscal year 1985–86. Resolution of the issue requires us to determine whether UMDNJ would be considered the alter ego of the State under the eleventh amendment. If so, it is not a "person" and, therefore, not liable under section 1983.

In determining whether an entity is an "alter ego" of the state for eleventh amendment purposes, the Third Circuit has adopted the following criteria:

[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

[*Urbano v. Board of Managers of N.J. State Prison*, 415 *F*.2d 247, 250–51 (3d Cir.1969), *cert. denied*, 397 *U.S.* 948, 90 *S.Ct.* 967, 25 *L.Ed.*2d 129 (1970) (quoting *Krisel v. Duran*, 258 *F.Supp.* 845, 849 (S.D.N.Y.1966), *aff'd per curiam*, 386 *F*.2d 179 (2d Cir.1967), *cert. denied*, 390 *U.S.* 1042, 88 *S.Ct.* 1635, 20 *L.Ed.*2d 303 (1968) (footnotes omitted)).]

*See Blake v. Kline*, 612 *F*.2d 718, 722–26 (1979). Some federal courts have followed *Urbano. E.g., Hall v. Medical College of Ohio at Toledo*, 742 *F*.2d 299, 302–07 (6th Cir.1984); *Bowen v. Hackett*, 387 *F.Supp.* 1212, 1220 (D.R.I.1975). Other federal courts have cited *Urbano* with approval. *E.g., Morrison–Knudsen Co. v. Massachusetts Bay Transp.*, 573 *F.Supp.* 698, 703 (D.Idaho 1983); *Martin v. Choudhuri*, 563 *F.Supp.* 207, 210 n. 2 (W.D.Wis.1983); *Henry v. Texas Tech Univ.*, 466

*F.Supp.* 141, 145 (N.D.Tex.1979); *Holley v. Lavine,* 464 *F.Supp.* 718, 723 (W.D.N.Y.1979).

Stated separately, the nine *Urbano* factors, as they are known, are: (1) local law and decisions; (2) whether, in the event plaintiff prevails, the judgment will have to be paid out of the state treasury; (3) whether the entity has the funds or the power to satisfy the judgment; (4) whether the entity performs a proprietary or a governmental function; (5) whether the entity has been separately incorporated; (6) the entity's degree of autonomy over its operations; (7) whether it has the power to sue and be sued and to enter into contracts; (8) whether the entity's property is immune from state taxation; and (9) whether the sovereign has immunized itself from responsibility for the entity's operations.

■ Turning to the application of the factors to UMDNJ, the Third Circuit has concluded that a section 1983 action may be maintained against UMDNJ. *Mauriello v. University of Medicine & Dentistry,* 781 *F.*2d 46 (3d Cir.), *cert. denied,* —— U.S. ——, 107 *S.Ct.* 80, 93 *L.Ed.*2d 35 (1986). Nonetheless, the Attorney General directs our attention to *English v. College of Medicine and Dentistry of N.J.,* 73 *N.J.* 20 (1977), to support his argument that UMDNJ is the alter ego of the State. *English,* however, was concerned not with eleventh amendment immunity, but with UMDNJ's right to discharge the supervisor of the morgue. Similarly, none of the other reported decisions involving the then College of Medicine and Dentistry, the predecessor of UMDNJ, involved the immunity of the College under the eleventh amendment. *College of Medicine and Dentistry of N.J. v. Morrison,* 141 *N.J.Super.* 104 (App.Div.1976) (director of nursing is an employee-at-will subject to termination by College); *Rich v. State,* 171 *N.J.Super.* 91, 93 (Law Div.1979) (under predecessor statute, College is a state agency without power to sue and be sued, and suit for negligent scalding of patient was brought against State); *De Angelis v. Addonizio,* 103 *N.J.Super.* 238 (Law Div.1968) (UMDNJ employees not

entitled to Civil Service status). Furthermore, all these cases were decided before the 1981 amendments to the Medical and Dental Education Act, *L.*1981, *c.* 325, which provided for "a greater degree of administrative autonomy" for UMDNJ, Senate Education Committee Statement Accompanying *L.*1981, *c.* 325, a consideration that would diminish whatever persuasiveness might inhere in those decisions. From the foregoing, we conclude that "local law and decisions," the first *Urbano* factor, is not helpful in resolving the issue.

The most important consideration, represented by the second and third *Urbano* factors, is whether payment of any judgment against UMDNJ would be made from its funds or those of the State Treasury. *Blake v. Kline, supra,* 612 *F.*2d at 723; *see also Ford Motor Co. v. Department of Treasury of Indiana,* 323 *U.S.* 459, 464, 65 *S.Ct.* 347, 350, 89 *L.Ed.* 389, 394 (1945) ("when the action is in essence one for the recovery of money from the state, the state * * * is entitled to invoke its sovereign immunity from suit"). According to the 1985–86 appropriations handbook, the total appropriation for UMDNJ was $95,278,000, and the Attorney General informs us that according to the appropriations bill for that fiscal year, the appropriation constituted approximately 39% of UMDNJ's operating budget or 52.4% if payment of fringe benefits, payments in lieu of taxes, and debt service are included. The balance of UMDNJ's funds are derived from private sources, such as tuition fees or payments by patients at University Hospital. *N.J.S.A.* 18A:64G–6(e). Furthermore, the Medical and Dental Education Act expressly provides that none of its provisions "shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit, of the State of New Jersey." *N.J.S.A.* 18A:64G–15. From this, we conclude that the State will not be required to pay directly any judgment rendered against UMDNJ and that UMDNJ can satisfy any such judgment with funds from private sources. That conclusion does not deprecate the substantial funds appropriated by the State for UMDNJ, but "even significant state financial support will not

necessarily encase an entity with eleventh amendment immunity." *Blake v. Kline, supra*, 612 *F*.2d at 724. Although the Legislature might increase the size of an appropriation because of the payment by UMDNJ of any judgment rendered against it, the indirect effect of that payment on the State Treasury is not sufficient to invoke eleventh amendment immunity. *Id.* at 726 (citing *Edelman v. Jordan, supra*, 415 *U.S.* at 668, 94 *S.Ct.* at 1358, 39 *L.Ed.*2d at 675).

As to the fourth *Urbano* factor, it is unclear whether UMDNJ is performing a governmental or proprietary function. The declaration in the authorizing legislation indicates that UMDNJ performs a governmental function. *See N.J.S.A.* 18A:64G–3 ("exercise by the university of the powers conferred by this act * * * shall be deemed to be public and essential governmental functions necessary for the welfare of the State and the people of New Jersey"); *cf. Miller v. Rutgers*, 619 *F.Supp.* 1386, 1391 (D.N.J.1985) ("as an educational institution, Rutgers is performing a governmental * * * function"). On the other hand, operating a medical school may be viewed as a proprietary activity often performed by private entities. In short, the nature of UMDNJ as a governmental or proprietary entity is unclear.

With respect to the fifth *Urbano* factor, the 1981 amendments to the enabling statute for the first time established UMDNJ as "a body corporate and politic." *N.J.S.A.* 18A:64G–3; Senate Education Committee Statement Accompanying *L.*1981, *c.* 325. In respect of the sixth *Urbano* factor, which pertains to the autonomy of UMDNJ over its operations, the 1981 amendments further "declared [it] to be the public policy of the State that the university shall be given a high degree of self-government and that the government and conduct of the university shall be free of partisanship." *N.J.S.A.* 18A:64G–3.-2. That autonomy is consistent with UMDNJ's power to contract, *N.J.S.A.* 18A:64G–6(*l*); to acquire property by gift, purchase and condemnation, *N.J.S.A.* 18:64G–6(n)(1); and to borrow money without obligating the State, *N.J.S.A.* 18A:64G–

6(*o*). The 1985 amendments, *L.*1985, *c.* 514, also permitted UMDNJ to purchase without public bidding services and materials costing no more than "$12,500 or the amount determined by the Governor as provided herein * * *." *N.J.S.A.* 18A:64G–6(n)(2). In addition, UMDNJ may make capital expenditures up to $500,000 without the approval of the Board of Higher Education. *N.J.S.A.* 18A:64G–6(n)(3). The State retains some control over UMDNJ in that the power of the Board of Trustees to supervise the conduct of the University is subject to "general policies and guidelines set by the Board of Higher Education." *N.J.S.A.* 18A:64G–6. Except for the Chancellor of the Department of Higher Education and the Commissioner of Health, who serve ex officio, trustees are appointed by the Governor with the advice and consent of the Senate, and the Governor has the power to designate one of the voting members of the Board as its chairman. *N.J.S.A.* 18A:64G–4(c).

Concerning the seventh *Urbano* factor, UMDNJ has the power to contract. *N.J.S.A.* 18A:64G–6(*l*). Not so clear, however, is UMDNJ's power to sue and be sued. *See N.J.S.A.* 18A:64G–3.4. The Attorney General contends that UMDNJ does not have such a power to sue and be sued. That contention becomes problematic, however, upon considering that the Legislature has declared that the board of trustees has "in addition to the other powers and duties provided [in the Medical and Dental Education Act], * * * the powers, rights and privileges that are incident to the proper government, conduct and management of the university * * *," and that "such powers granted to the university or the board or reasonably implied, may be exercised without recourse or reference to any department or agency of the State, except as otherwise provided by this act. In addition, the board may retain independent counsel with the approval of the Attorney General." *N.J.S.A.* 18A:64G–7. Arguably, it would make little sense to authorize the Board to retain independent counsel if it could not sue and be sued, and the broad powers granted to the board include that power. This precise point has not been presented to us in

sufficient detail, and without further exploration of the legislative history, we are reluctant to resolve the issue in this case. Hence, we find that the seventh *Urbano* factor is inconclusive.

Turning to the eighth *Urbano* factor, UMDNJ, like other non-profit colleges and hospitals, is immune from taxation. *N.J.S.A.* 54:4–3.6. With respect to the ninth *Urbano* factor, the immunity of the State from the operations of UMDNJ, the statute authorizes UMDNJ to borrow money, *N.J.S.A.* 18A:64G–6(*o*), and, as previously indicated, the State is not responsible for sums borrowed by or judgments against UMDNJ, *id.; N.J.S.A.* 18A:64G–15.

On balance, we find that the *Urbano* factors tip in favor of finding that UMDNJ is not the alter ego of the State for eleventh amendment purposes and, therefore, is liable as a "person" under section 1983.

## –III–

■ Having made that determination, we now must decide whether plaintiff's failure to file a notice of claim within ninety days of the date of her injury as required by the Act, *N.J.S.A.* 59:8–8, 9, precludes her section 1983 claim. The Appellate Division held that the notice provisions of the Act do not apply to section 1983 actions and, therefore, do not bar plaintiff's claim based on section 1983. We agree. That conclusion follows from the interplay between the Act and section 1983.

Pursuant to the Act, a person having a claim against a public entity must file a notice of claim with the entity within ninety days of accrual of the claim. *N.J.S.A.* 59:8–8a. A "public entity" includes "the State, * * * public authority, public agency, and any other political subdivision or public body in the State." *N.J.S.A.* 59:1–3. Failure to file a timely notice of claim bars the claimant from recovering against the public entity, *N.J.S.A.* 59:8–8a, except that within one year a judge of the Superior Court may permit late filing of the notice of claim, *N.J.S.A.* 59:8–9. UMDNJ, as "a body corporate and politic"

within the Department of Higher Education, *N.J.S.A.* 18A:64G–3, is a "public entity" within the meaning of the Act. Consequently, claims against it are subject to the notice requirement of the Act.

As a federal statute, however, section 1983 is entitled to the protection of the Supremacy Clause, article VI, of the United States Constitution, which precludes state laws that thwart the purposes of federal legislation. *McGlynn v. New Jersey Pub. Broadcasting Auth.*, 88 *N.J.* 112, 137 (1981). Barring a section 1983 claim for failure to satisfy the notice provisions of the Act would permit state legislation to deny a federal right in violation of the Supremacy Clause. *See T & M Homes, Inc. v. Township of Mansfield*, 162 *N.J.Super.* 497 (Law Div.1978). Accordingly, we hold that the notice provisions of the Act do not apply to plaintiff's section 1983 claims. *See Lloyd v. Stone Harbor*, 179 *N.J.Super.* 496 (Ch.Div.1981).

This holding is in accord with the majority of out-of-state cases, which have held that the notice of claim provisions in their respective tort claims acts are inapplicable to actions brought pursuant to section 1983. *See Williams v. Horvath*, 16 *Cal.*3d 834, 129 *Cal.Rptr.* 453, 548 *P.*2d 1125 (1976); *Mucci v. Falcon School Dist. No. 49*, 655 *P.*2d 422 (Colo.App.1982); *Overman v. Klein*, 103 *Idaho* 795, 654 *P.*2d 888 (1982); *Tomas v. Universal Health Services, Inc.*, 145 *Ill.App.*3d 663, 99 *Ill.Dec.* 451, 495 *N.E.*2d 1186 (1986); *Spencer v. City of Seagoville*, 700 *S.W.*2d 953 (Tex.App.1985); *Doe v. Ellis*, 103 *Wis.*2d 581, 309 *N.W.*2d 375 (Wis.App.1981). *But see Felder v. Casey*, 139 *Wis.*2d 614, 408 *N.W.*2d 19, *cert. granted,* —— *U.S.* ——, 108 *S.Ct.* 326, 98 *L.Ed.*2d 354 (1987); *Indiana Dep't of Pub. Welfare v. Clark*, 478 *N.E.*2d 699 (Ct.App.1985), *cert. den.*, 476 *U.S.* 1170, 106 *S.Ct.* 2893, 90 *L.Ed.*2d 980 (1986); *Mills v. County of Monroe*, 59 *N.Y.*2d 307, 464 *N.Y.S.*2d 709, 451 *N.E.*2d 456, *cert. denied*, 464 *U.S.* 1018, 104 *S.Ct.* 551, 78 *L.Ed.*2d 725 (1983). The California precedents are particularly persuasive for our purposes because the New Jersey Tort Claims Act was patterned after the California Tort Claims Act of 1963. *Kleinke v.*

*Ocean City,* 147 *N.J.Super.* 575, 579 (App.Div.1977) (citing *Report of the Attorney General's Task Force on Sovereign Immunity* at 10 (1972)) (*Attorney General's Report*). In *Williams v. Horvath, supra,* 16 *Cal.*3d at 841, 129 *Cal.Rptr.* at 457–58, 548 *P.*2d at 1129–30, the California Supreme Court reasoned that the purposes underlying section 1983 may not be frustrated by state substantive limitations couched in procedural language and that the supremacy clause will not permit such abrogation of a federal right.

Our holding is also consistent with the overwhelming majority of federal cases, which have uniformly refused to apply the state notice of claim requirement to actions brought pursuant to section 1983. *Brown v. United States,* 742 *F.*2d 1498, 1509 (D.C.Cir.1984); *see* cases cited *id.* at n. 6; *Gamel v. City of San Francisco,* 633 *F.Supp.* 48 (N.D.Cal.1986); *Burroughs v. Holiday Inn,* 621 *F.Supp.* 351 (W.D.N.Y.1985); *Williams v. Allen,* 616 *F.Supp.* 653 (E.D.N.Y.1985); *cf. Wilson v. Garcia,* 471 *U.S.* 261, 279, 105 *S.Ct.* 1938, 1949, 85 *L.Ed.*2d 254, 268 (1985) ("Congress * * * intended that the remedy provided in [42 *U.S.C.A.*] § 1983 be independently enforceable whether or not it duplicates a parallel state remedy" (citing *Monroe v. Pape,* 365 *U.S.* 167, 173, 81 *S.Ct.* 473, 476, 5 *L.Ed.*2d 492 (1961))). *But see Cardo v. Lakeland Cent. School Dist.,* 592 *F.Supp.* 765 (S.D.N.Y.1984) (federal case applying the state notice requirement).

–IV–

■ We now turn to the issue whether the notice provisions of the Act apply to plaintiff's claim under the Law. In holding that the notice provisions did not apply, the Appellate Division reasoned that the Law contains its own notice provisions and that the Legislature could not have intended that a discrimination claim be included within the coverage of the Act. Again, we agree. By declaring as a "civil right" that all persons shall have "the opportunity to obtain employment," *N.J.S.A.* 10:5–4, the Law prohibits employers from discriminating against em-

ployees because of their sex, *N.J.S.A.* 10:5–12(a). The term "employer" was amended in 1977 to include "the State * * * and all public officers, agencies, boards or bodies." *N.J.S.A.* 10:5–5(e). UMDNJ, therefore, is an employer within the meaning of the Law.

We acknowledge that the Legislature has not expressly described the relationship between the Act and the Law, and that the history of neither statute refers to the other. The Act does not specifically include discrimination, and the Law does not indicate that the Legislature intended discrimination to be treated as a tort. In the absence of a clear direction from the Legislature, another part of the Appellate Division concluded that acts of discrimination are included within the term "injury" as defined in the Act. *Healey v. Township of Dover,* 208 *N.J.Super.* 679, 682 (1986) (claims of sexual discrimination and harassment "fall within the expansive Tort Claims Act definition of 'injury' that includes 'injury to a person' and 'damage to or loss of property.' "). The Chancery Division, moreover, has concluded that a claim of sexual discrimination predicated upon the New Jersey Constitution is an "injury" under the Act. *Lloyd v. Stone Harbor, supra,* 179 *N.J.Super.* at 511–12. Additionally, one state supreme court has recognized a sexual harassment claim as a tort claim. *Phillips v. Smalley Maintenance Servs.,* 435 *So.*2d 705 (Ala.1983) (employer's sexual solicitation constitutes a wrongful invasion of privacy). Finally, the United States Supreme Court has also stated that a discrimination claim under section 1983 is a "tort action for the recovery of damages for personal injuries * * *." *Wilson v. Garcia, supra,* 471 *U.S.* at 275–77, 105 *S.Ct.* at 1947–48, 85 *L.Ed.*2d at 266–67.

Furthermore, we recognize that the Legislature intended that the Act would provide a comprehensive scheme for adjudicating tort claims against public entities. For example, in stating generally the immunity of public entities, the Legislature declared: "Except as otherwise provided by this [A]ct, a public entity is not liable for an injury, whether such injury arises out

of an act or omission of the public entity or public employee or any other person." Furthermore, *N.J.S.A.* 59:2-2, which provides for the liability of a public entity, states:

a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.

b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.

"Injury" is broadly defined as: "death, injury to a person, damage to or loss of property or any other injury that a person may suffer that would be actionable if inflicted by a private person." *N.J.S.A.* 59:1-3.

Notwithstanding the breadth of the definition, ambiguity lurks in the term "injury." Because we are concerned in the present case with the relationship between the Act and the Law, we must consult both statutes in addressing this ambiguity. To find the legislative intent behind a statute, particularly as it applies to a specific controversy, a court should consider the entire legislative scheme. *Lott v. Mayor & Council of Borough of Franklin*, 21 *N.J.* 274, 277-78 (1956); *see, e.g., Terry v. Mercer County Freeholder Bd.*, 86 *N.J.* 141, 150-52 (1981) (legislative intent of both the Civil Service statutes and the Law relevant to determining whether a remedial promotion under the Law violated the Civil Service statutory "rule of three"). Thus, in the present case, we read the Act in the light of the Law. So viewed, the inquiry becomes whether the Legislature intended a discriminatory act allegedly committed by a public entity to be an injury subject to the notice requirements of the Act.

We begin by recognizing that the clear public policy of this State is to abolish discrimination in the work place. Indeed, the overarching goal of the Law is nothing less than the eradication "of the cancer of discrimination." *Jackson v. Concord Co.*, 54 *N.J.* 113, 124 (1969). As the Legislature has declared, "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and

functions of a free democratic State." *N.J.S.A.* 10:5–3. The day is long past when any employee need endure discrimination because of his or her race, religion, national origin, or gender. Employment discrimination is not just a matter between employer and employee. The public interest in a discrimination-free work place infuses the inquiry. *David v. Vesta Co.*, 45 *N.J.* 301, 327 (1965).

In contrast to the sweep of the Law, the Act seeks to provide compensation to tort victims without unduly disrupting governmental functions and without imposing excessive financial burden on the taxpaying public. *See N.J.S.A.* 59:1–2 (legislative declaration); *N.J.S.A.* 59:2–1 comment.

With their contrasting backgrounds in mind, we turn to the history, purpose, and text of each statute. As a historical matter, the Act is the legislative response to this Court's decision in *Willis v. Department of Conservation & Economic Dev.*, 55 *N.J.* 534 (1970), which abrogated total governmental immunity from tort liability. According to the Act's stated purpose, it is "the public policy of this state that public entities shall only be liable for their negligence within the limitations of this Act." *N.J.S.A.* 59:1–2. That declaration pertaining to negligent conduct sheds little light on the Legislature's intention concerning discrimination, which depends on proof of motive or intent. *Goodman v. London Metals Exch., Inc.*, 86 *N.J.* 19, 30 (1981) (proof of discriminatory motive or intent a crucial element of a discrimination case). *Cf. Andersen v. Exxon Co.*, 89 *N.J.* 483 (1982) (motive to discriminate must be found objectively reasonable if it is to serve as a defense). The difference between the substantive standard for negligence, which was clearly a legislative concern in the Act, and the Law's implicit emphasis on motive or intent suggests that the Legislature did not intend that the Act apply to discrimination claims under the Law. In recognizing that difference, we need not determine whether the Act is limited to negligent conduct.

Consistent with its purpose of restricting governmental liability in tort, the Act provides that failure to notify a public entity within ninety days of accrual results in the bar of a tort claim. *N.J.S.A.* 59:8-8a. That relatively short time for filing was drafted to provide public entities with prompt notice so they could investigate and settle claims, *N.J.S.A.* 59:8-3 comment (a), and, thereby, protect the public fisc.

Reflecting its concern with eliminating discrimination, the Law contains different procedural requirements. Under the Law, an aggrieved person may either file an administrative complaint with the Director of the Division on Civil Rights or file a civil action in the Superior Court. *N.J.S.A.* 10:5-13; *see Sprague v. Glassboro State College,* 161 *N.J.Super.* 218, 225 (App.Div.1978). Once the aggrieved party files a Superior Court action, however, he or she may not file an administrative complaint with the Division during the pendency of the suit. *N.J.S.A.* 10:5-13, 27; Assembly Judiciary, Law, Public Safety and Defense Committee Statement Accompanying *L.*1979, *c.* 404. Likewise, if the complainant first files with the Division, he or she may not file a complaint with the Superior Court while the administrative action is pending. *See Hermann v. Fairleigh Dickinson Univ.,* 183 *N.J.Super.* 500, 504-05 (App. Div.), certif. denied, 91 *N.J.* 573 (1982).

The Law contains its own procedural requirements for filing pleadings, *N.J.S.A.* 10:5-13, 16; notice to the Division and parties, *N.J.S.A.* 10:5-13, 15; conciliation, *N.J.S.A.* 10:5-14; and time limitation on actions, *N.J.S.A.* 10:5-18. In particular, the Law requires that a complaint must be "filed within 180 days after the alleged act of discrimination." *Id.* These procedural provisions pertain only to administrative actions before the Division, *see N.J.A.C.* 13:4-1.1 to :12 (regulations applicable only to administrative remedy), and, contrary to the implication of the Appellate Division, 210 *N.J.Super.* at 579, do not apply to civil actions in the Superior Court. The Law contains no limitations or other procedural requirements for claimants who elect to proceed in the Superior Court. Additionally, the 1977

amendment extending the definition of "employers" to include public entities, *N.J.S.A.* 10:5–5(e), reflects the Legislature's intention to subject those entities to the procedures of the Law.

Yet another difference between the two statutes is the manner in which each addresses damages. The Act prohibits the award of damages for pain and suffering, except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00" *N.J.S.A.* 59:9–2(d). That limitation "reflects the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective type of damages, such as pain and suffering, except in aggravated circumstances \* \* \*." *Id.* at comment; *Attorney General's Report, supra,* at 17. Consequently, a claimant may not recover under the Act for "the intangible, subjective feelings of discomfort that are associated with personal injuries." *Ayers v. Jackson Township,* 106 *N.J.* 557, 571 (1987).

By comparison, the Law does not prohibit damages for pain and suffering. Awards under the Law are intended to serve not only the interest of the individual involved but "it is plain that the public interest is also involved." *Jackson v. Concord Co., supra,* 54 *N.J.* at 124–25. This Court has approved the administrative interpretation of the law by the Director of the Division on Civil Rights to permit so-called "humiliation damages." *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N.J.* 399, 415–16 (1973); *Goodman v. London Metals Exch., Inc., supra,* 86 *N.J.* 24. Although such damages are "incidental," they are not circumscribed by the same requirements pertaining to the recovery of pain and suffering damages under the Act. Arguably, therefore, the Legislature contemplated different treatment for the humiliation and pain and suffering of discrimination victims than that provided by the Act.

Our reading of the history, purpose, and provisions of the two acts leads us to conclude that the Legislature did not intend

that claims of discrimination be subject to the notice require-ments of the Act.  We do not hold, or even suggest, that the Legislature may not include discrimination claims within the Act.  We conclude only that the Legislature has not yet done so.  In sum, the notice requirement of the Act does not apply to plaintiff's claims of discrimination against UMDNJ under either section 1983 or the Law.

The judgment of the Appellate Division is affirmed, and the matter is remanded to the Law Division.

Justice HANDLER has filed a separate concurring opinion in which Justice CLIFFORD joins.

*For affirmance* —Justices HANDLER, CLIFFORD, O'HEARN, GARIBALDI, POLLOCK and STEIN—6.

*For reversal* —None.

HANDLER, Justice, concurring.

In this case, the Court affirms the judgment of the Appellate Division upholding plaintiff's right to bring an unlawful gender-discrimination complaint against the University of Medicine and Dentistry (UMDNJ) unemcumbered by the restrictions of the New Jersey Tort Claims Act.

I join in this determination of the Court, but write separately to express more emphatically the view that the result reached by the Court not only accommodates the legislative intent underlying both the Law Against Discrimination and the Tort Claims Act, but further, this result clearly advances our strong public policy in maximizing protections against invidious dis-crimination.

## I.

A convenient point of embarkation for an analysis of this issue is the language of the Tort Claims Act.  The primary focus of the Act is on negligence and similar tortious conduct impliedly involving fault.  The legislative declaration of the Act

states that "it is hereby declared to be the public policy of this state that public entities shall only be liable for their *negligence* within the limitations of this act ..." *N.J.S.A.* 59:1–2 (emphasis added). Elsewhere the Act refers to a "negligent or wrongful act." *N.J.S.A.* 59:3–9; 59:4–2a. *N.J.S.A.* 59:9–2b, for example, provides that "[n]o judgment shall be granted against a public entity or public employee on the basis of strict liability, implied warranty, or products liability." [1] The notion that the Act is concerned essentially with tortious conduct involving fault in the sense of a want of reasonable care is also indicated by the Act's exclusion of public entity liability for certain kinds of intentional torts. *N.J.S.A.* 59:2–10 provides that public entities are not liable for the acts or omissions of employees "constituting a crime, actual fraud, actual malice, or willful misconduct."

In light of these provisions, I have little doubt—perhaps less than the Court—that the Legislature did not intend to include unlawful discrimination violative of the Law Against Discrimination as an "injury" to be governed by the Act. Fault or lack of reasonable care, which are the basis of "negligence," are generally not essential in determining whether conduct constitutes invidious discrimination that is unlawful under the Law

---

[1]For example, the treatment of nuisance actions against the state under the Act supports the view that the Legislature was primarily concerned with addressing negligence actions when it drafted the Tort Claims Act. The Court has held that public entity liability for nuisance is recognized under the Tort Claims Act, *see Birchwood Lakes Colony Club v. Medford Lakes*, 90 *N.J.* 582, 593 (1982). Its decision in that case was strongly influenced by *N.J.S.A.* 59:4–2, the section concerning liability for the condition of public property. This section, with its "palpably unreasonable" standard, noted by the Court, see *id.* at 594, in effect immunizes a public entity from nuisance damages unless the public entity was "negligent"—that is, "palpably unreasonable"—in failing to correct the dangerous condition. It should also be noted that the Comment to *N.J.S.A.* 59:4–2 indicates that the section "comports generally with the principles of liability established by the New Jersey courts for local public entities in their capacity as landowners," and pre-Tort Claims Act authority indicates that nuisance actions against local entities were dependent on negligence. *Milstrey v. City of Hackensack*, 6 *N.J.* 400, 406, 409–12 (1951).

Against Discrimination. Moreover, such unlawful discrimination frequently entails purposeful, willful, or intentional conduct. As noted, a claim brought under the Act that is based on intentionally tortious conduct of an employee would not render the public entity vicariously liable, *N.J.S.A.* 59:2-10, this notwithstanding the offending employee would be personally liable, *N.J.S.A.* 59:3-14. As the Appellate Division observed:

> We note also, that the Tort Claims Act provides no immunity for willful or malicious acts caused either by the employee or the entity itself. The Tort Claims Act in *N.J.S.A.* 59:3-14a and b permits personal liability and full recovery against a public employee for the results of actual malice or willful misconduct. *N.J.S.A.* 59:2-10 forbids only vicarious liability for such conduct on the part of a public entity. Discriminatory conduct actionable under the Law Against Discriminatory is more akin to the malicious or willful acts exempted from the Tort Claims Act than the negligently or similarly inflicted injuries covered thereby. [*Fuchilla v. Layman*, 210 *N.J.Super.* 574, 579 (App.Div. 1986).]

Moreover, if the Act were to apply, it would preclude the imposition of vicarious liability on public entity employers for unlawful discrimination under the Law. *Cf. N.J.S.A.* 59:2-10 (a public entity is not exonerated for injury resulting from *its own* negligence or intentional misconduct.). A result that would immunize the public entity and stigmatize only the public employee for invidious discrimination would clearly be at variance with the Law Against Discrimination. To the extent public entities would be immunized under the Act from the consequences of discriminatory conduct of its employees, it is clearly out of sync with prevailing law. Under Title VII, the analogous federal statute, *compare* 42 *U.S.C.* § 2000e-2(a) *with N.J.S.A.* 10:5-12a, which is often looked to in interpreting the Law Against Discrimination, *see Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 81 (1978), the doctrine of *respondeat superior* is an integral part of the protection provided by the statutory scheme. Employers are held strictly liable for the discriminatory employment decisions of their supervisory personnel. *See, e.g., Flowers v. Crouch-Walker Corp.*, 552 *F.*2d 1277, 1282 (7th Cir.1977); E.E.O.C. Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(c) (1985) (employer liable for sexual harassment by supervisory employees regardless of

whether the employer knew or should have known of its occurrence).[2] In fact, awards on the grounds of *respondeat superior* or vicarious or derivative liability against employers whose employees' actions violate the Law have long been recognized. *See, e.g., Zahorian v. Russell Fitt Real Estate Agency*, 62 *N.J.* 399, 405 (1973). A result that drastically reduces responsibility for discrimination and so restricts the protection otherwise afforded its victims is strongly indicative of a legislative intent to exclude under the definition of the term "injury" in the Act unlawful discriminatory conduct. *See Firestone v. Fritz*, 119 *Ill.App.*3d 685, 75 *Ill.Dec.* 83, 87, 456 *N.E.*2d 904, 908 (1983) (the Illinois Tort Immunity Act applies only to tort actions, not civil rights actions); *cf. Union Free School Dist. No. 6 v. New York State Human Rights Appeal Bd.*, 35 *N.Y.*2d 371, 380–81, 362 *N.Y.S.*2d 139, 145, 320 *N.E.*2d 859, 862–63 (1974), reh. den., 36 *N.Y.*2d 807, 369 *N.Y.S.*2d 1026, 330 *N.E.*2d 657 (1975) (notice of claim was not required for action based on sex discrimination because of public interest exception to notice requirement).

I find especially significant the history of the Tort Claims Act. This further underscores the notion that the Legislature intended to govern redress only for negligence and similar tortious wrongdoing and not for unlawful discrimination. The Act was a legislative response to the Court's abrogation of the State's tort sovereign immunity in *Willis v. Department of Conservation and Economic Dev.*, 55 *N.J.* 534 (1970). In *Willis*, the Court reviewed previous judicial limitations on the use of sovereign immunity as a defense. It is instructive to note that all of the cases cited involve claims of ordinary

---

[2]Although the United States Supreme Court has declined to adopt this standard and impose absolute liability in all cases of supervisor sexual harassment, it has also rejected the notion that absence of notice is an absolute defense for the employer, and has called for the determination of employer liability to be governed by general agency principles. *Meritor Sav. Bank v. Vinson*, 477 *U.S.* 57, 71–72, 106 *S.Ct.* 2399, 2408, 91 *L.Ed.*2d 49, 63 (1986). (A four justice concurrence would have adopted the E.E.O.C. guidelines. *See id.* at 74, 106 *S.Ct.* at 2409, 91 *L.Ed.*2d at 64 (Marshall, J., concurring)).

negligence. *Willis,* 55 *N.J.* at 540. The most common type of claim at issue were simple slip and fall cases, *see Amelchenko v. Borough of Freehold,* 42 *N.J.* 541 (1964); *Hayden v. Curley,* 34 *N.J.* 420 (1961); *Schwartz v. Borough of Stockton,* 32 *N.J.* 141 (1960); *Taylor v. New Jersey Highway Auth.,* 22 *N.J.* 454 (1956); *Milstrey v. City of Hackensack,* 6 *N.J.* 400 (1951), and most of the others involved allegations that governmental negligence created conditions that resulted in death or injury. *See Miehl v. Darpino,* 53 *N.J.* 49 (1968); *Bergen v. Koppenal,* 52 *N.J.* 478 (1968); *B.W. King Inc. v. Town of West New York,* 49 *N.J.* 318 (1967); *Visidor Corp. v. Borough of Cliffside Park,* 48 *N.J.* 214 (1966); *Fitzgerald v. Palmer,* 47 *N.J.* 106 (1966); *Goldberg v. Housing Auth. of the City of Newark,* 38 *N.J.* 578 (1962); *Cloyes v. Delaware Township,* 23 *N.J.* 324 (1957); *Kress v. City of Newark,* 8 *N.J.* 562 (1952); *Hartman v. City of Brigantine,* 42 *N.J.Super.* 247 (App.Div.1956), aff'd, 23 *N.J.* 530 (1957). Other cases involved situations where negligent supervision on the part of government officials led to the injury of third persons. *Jackson v. Hankinson,* 51 *N.J.* 230 (1968); *Titus v. Lindberg,* 49 *N.J.* 66 (1967); *McAndrew v. Mularchuk,* 33 *N.J.* 172 (1960); *Peer v. City of Newark,* 71 *N.J.Super.* 12 (App.Div.1961), certif. den., 36 *N.J.* 300 (1962). These cases represent not only the background against which the Legislature acted when it drafted the Act, but many of them also stood for particular propositions of law, which the Legislature incorporated into the Act. *See, e.g.,* Comment to *N.J.S.A.* 59:2-2, 59:2-3 (specific incorporation of the positions adopted by the Court in *McAndrew, Amelchenko* and *Bergen* ); *see also Miehl v. Darpino, supra,* 53 *N.J.* 49 (acknowledging existence of common-law immunity for tortious snow removal). None of these cases involved anything more than ordinary negligence.[3]

---

[3]The Legislature also looked to California, which had also judicially abrogated sovereign immunity, when it drafted New Jersey's Tort Claims Act. *Muskopf v. Corning Hosp. Dist.,* 55 *Cal.*2d 211, 11 *Cal.Rptr.* 89, 359 *P.*2d 457 (1961), in which the California Supreme Court abrogated that state's sovereign immu-

This history sheds a clear light on the purpose of the Tort Claims Act. It was to remedy the haphazard, costly, and inconsistent approach to governmental liability. *See Report of the Attorney General's Task Force on Sovereign Immunity* 11 (1972). It bears iteration that none of the plethora of judicial decisions that form the matrix of the Tort Claims Act involved a violation of a civil right. Quite clearly the Tort Claims Act was not needed to structure liability—or immunity —for such claims.

In this case, in ascertaining legislative intent, a consideration of the purposes and goals of both statutes—the Law Against Discrimination and the Tort Claims Act—is essential. *See Fuchilla v. Layman, supra,* 210 *N.J.Super.* at 579 (App.Div.1986). The objectives of the Law Against Discrimination are markedly different from those of the Tort Claims Act. As observed by the Appellate Division: "The Law Against Discrimination is directed at ending discrimination in employment and public accommodations while the Tort Claims Act provides liability for damages for the negligence of public entities." *Id.* at 578.

These contrasting legislative goals are manifest in very different statutory schemes. Awards under the Law Against

---

nity, involved a suit by a patient injured due to the negligence of hospital employees. The only other California case discussed by the Attorney General's Report is *Lipman v. Brisbane Elementary School Dist.,* 55 *Cal.*2d 224, 11 *Cal.Rptr.* 97, 359 *P.*2d 465 (1961), decided on the same day as *Muskopf,* in which the California Court refused to impose liability. *Lipman* thus was available to both the California and (later) New Jersey legislatures as a guide to how the scope of a tort claims act could be limited. *Lipman* involved a case in which a school district superintendent alleged that members of the school board, while acting in their official capacity, maliciously engaged in conduct for the purpose of discrediting her reputation and forcing her out of her job. It is thus the closest analog to a discrimination/harassment suit that is discussed in the Attorney General's Report. In *Lipman* the court ruled that the alleged acts of the board fell within a discriminatory exception to the general rule of liability. *Report of the Attorney General's Task Force on Sovereign Immunity,* 81–82 (1972). The case, I emphasize, did not involve a claim of constitutional or statutory discrimination and does not in the slightest suggest that such a claim could not be brought against a public entity.

Discrimination "are intended to serve not only the interest of the individual involved but the public interest as well." *Jackson v. Concord Co., supra,* 54 *N.J.* at 124–25. Awards for personal mortification can be made under the Law because compensation for a victim's humiliation is "reasonably calculated to eliminate the effects of discrimination." *Zahorian v. Russell Fitt Real Estate Agency, supra,* 62 *N.J.* at 416 (quoting *Williams v. Joyce,* 4 *Or.App.* 482, 479 *P.*2d 513 (1971)) (interpreting an Oregon antidiscrimination statute similar to that of New Jersey). Such awards have long been recognized in judicial actions, *see, e.g., Gray v. Serruto Builders, Inc.,* 110 *N.J.Super.* 297, 317 (Ch.Div.1970), and in administrative actions under the Law, *see, e.g., Zahorian v. Russell Fitt Real Estate Agency, supra,* 62 *N.J.* at 413–16, and such exemplary damages have been awarded even against public entity defendants. *See, e.g., Roberts v. Keansburg Bd. of Educ.,* 5 *N.J.A.R.* 208, 268 (Adm.1983).

The Act disavows any remedial purpose to vindicate societal interests or to rectify public or governmental misconduct or to protect any individual constitutional interest or civil right. It thus expressly prohibits exemplary or punitive damages under the Act. *N.J.S.A.* 59:9–2c. The Act eschews compensation for pain and suffering of the tort victim. *N.J.S.A.* 59:9–2d. This limitation on pain and suffering was intended to prevent compensation for "the intangible subjective feelings of discomfort that are associated with personal injuries[,]" *Ayers v. Jackson Township,* 106 *N.J.* 557, 571–72 (1987), reflecting a judgment that "in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages ..." *Report of the Attorney General's Task Force on Sovereign Immunity, supra,* at 234.

The Act thus ignores what the Law seeks to prevent. The Law Against Discrimination is solicitous of the hurt endured by a victim of discrimination. It is designed so that no citizen shall be subject to the embarrassment and humiliation of discrimination. *See, e.g., Evans v. Ross,* 57 *N.J.Super.* 223, 231 (App.

Div.), certif. den., 31 *N.J.* 292 (1959). In stark and dramatic opposition to the purposes of the Tort Claims Act, the philosophy and spirit of remedial awards available under the Law Against Discrimination are "fine-tuned to the nuances of discrimination and the psychological as well as economic suffering it causes." *Castellano v. Linden Bd. of Educ.*, 79 *N.J.* 407, 417 (1979) (Handler, J., concurring in part and dissenting in part).

Distinctive substantive standards, as well as procedural rules, have been developed in the litigation of a claim under the Law Against Discrimination to advance its special goals of combatting discrimination. To reduce what otherwise might be an "insuperable burden" of proving discriminatory motive or intent, *see Goodman v. London Metals Exch. Inc.*, 86 *N.J.* 19, 30 (1981), courts under the Law have borrowed procedures developed in litigation under federal antidiscrimination statutes. *See, e.g., Peper v. Princeton Univ. Bd. of Trustees, supra,* 77 *N.J.* at 81 (adopting procedures formulated in *McDonnell–Douglas v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973), in litigation under Title VII, 42 U.S.C. § 2000e (1982)); *Giammario v. Trenton Bd. of Educ.,* 203 *N.J.Super.* 356, 361 (App.Div.1985) (looking to application of the Age Discrimination in Employment Act, 29 U.S.C. § 621 to § 634 (1982)). These standards aid the victims of age or sex discrimination under the Law by creating a presumption of invidious motive or intent if the claimant can show that an employment practice of the employer has a significant discriminatory impact. *See, e.g., Goodman, supra,* 86 *N.J.* at 30; *Peper,* 77 *N.J.* at 84; *see also Andersen v. Exxon Co., supra,* 89 *N.J.* 483, 499–500 (in handicap discrimination cases, motive or intent is presumed on a showing that the claimant is handicapped but capable of doing the job, thus shifting to the employer the burden of justifying his treatment of the claimant).

These substantive liability standards under the Law Against Discrimination are totally at odds with the deference to governmental discretion that serves as a cornerstone for the scheme

of liability established by the Tort Claims Act. For example, *N.J.S.A.* 59:2–3 excludes most discretionary decisions from any judicial review, *N.J.S.A.* 59:2–3a–c, and tests the validity of the rest against a "palpably unreasonable" standard, *N.J.S.A.* 59:2–3d, a standard at variance with the substantive principles of law that govern a claim of unlawful discrimination. *See Flanders v. William Paterson College of New Jersey,* 163 *N.J.Super.* 225, 229–31 (App.Div.1976) (an objectively reasonable decision granting tenure to the younger of two candidates could be struck down under the Law Against Discrimination); *see also Lipman v. Brisbane Elementary School Dist.,* 55 *Cal.*2d 224, 11 *Cal.Rptr.* 97, 359 *P.*2d 465 (1961) (claims of malicious harassment in employment under California law fall within discretionary-exception from liability of public entity).

It follows from this analysis and comparison of different goals, substantive standards, procedural rules, and remedial provisions that an interpretation of the Law that requires the superimposition of the Tort Claims Act to claims of unlawful discrimination would be wholly inconsistent with the intent of the Legislature when it provided expressly for suits under the Law to be brought in Superior Court. *N.J.S.A.* 10:5–13 was amended in 1979 expressly to authorize suits to be brought initially in Superior Court. *L.*1979 *c.* 404, § 1. This codified and strengthened the existing common-law practice of allowing judicial actions to vindicate this statutory civil right. *See, e.g., Gray v. Serruto Builders, Inc., supra,* 110 *N.J.Super.* at 305–11. According to the Governor's Statement, a purpose of this amendment is to "reduce the backlog of cases and the costs in the Division of Civil Rights." Governor's Statement on signing S–3101 (L.1979 c. 404 § 1). There is no dispute that this amendment was intended to enhance the option of a civil suit. Consequently, any interpretation of the Law that makes the initiation of discrimination suits in Superior Court less attractive than administrative proceedings before the Division on Civil Rights must be viewed as a disincentive, frustrating the intended effect of the 1979 amendment.

Application of the Act's ninety-day notice provision would certainly have the effect of making Superior Court suits a less attractive option. Under the Law, a complainant has 180 days from the time of the alleged discrimination to file an administrative complaint. *N.J.S.A.* 10:5–18. If the ninety-day notice provision of the Act is read to apply to suits under the Law, any complainant who, for the financial, educational, or social reasons noted in *David v. Vesta Co., supra,* 45 *N.J.* at 327 had failed to file a notice of claim within ninety days would be forced back into the same overburdened administrative system the 1979 amendment was intended to relieve. Not only is the individual claimant barred from redress, the public interest in eradicating invidious discrimination is disserved.

It cannot be overstated that under the Law the Legislature has provided a wide assortment of remedial weapons to combat discrimination. A complainant has the option of either filing an administrative complaint with the Director of the Division on Civil Rights or filing a civil action with the Superior Court. *N.J.S.A.* 10:5–13, 10:5–27; *see Sprague v. Glassboro State College,* 161 *N.J.Super.* 218, 225 (App.Div.1978). These several remedies are not antithetical but complementary. While a claimant may pursue only one remedial route at a time, he or she may seek alternative or successive vindication. *See, e.g., Hermann v. Fairleigh Dickinson Univ.,* 183 *N.J.Super.* 500, 504–05 (App.Div.), certif. denied, 91 *N.J.* 573 (1982).

Judicial actions to enforce the civil right to be free from discrimination are created to provide something in addition to what is provided by the administrative remedy. *Christian Bros. Inst. v. Northern New Jersey Interscholastic League,* 86 *N.J.* 409, 415 (1981) (discrimination claims have alternative state statutory and constitutional and federal statutory and constitutional remedies); *see also Lally v. Copygraphics,* 85 *N.J.* 668, 672 (1981) (penal and administrative remedies based on retaliatory firing for the filing of workers compensation claims augmented by judicial remedy for retaliatory discharge). The prevailing assumption is that the relief provided

in the civil action will at least be as great as, or comparable to, available administrative remedies. *See Zahorian v. Russell Fitt Real Estate Agency, supra,* 62 *N.J.* at 417 n. 1 (Hall, J., dissenting); *Peper v. Princeton University, supra,* 151 *N.J.Super.* 15, 23 rev'd, 77 *N.J.* 55 and *Gray v. Serruto Builders, Inc., supra,* 110 *N.J.Super.* at 306–07.

## II.

Any interpretation of the current statutory scheme that engrafts upon the Law the Tort Claims Act, with its shorter notice filing period, higher standards of liability, heavier burdens of proof, reduced damages, and broad immunity provisions would substantially weaken the relief that could be obtained in a judicial civil rights action for unlawful discrimination under the Law. I do not for a moment believe that it was legislative inadvertence or carelessness that accounts for the possible failure to include invidious discrimination cases under the Tort Claims Act. It is to me inconceivable that the Legislature contemplated such inclusion or indeed might even be sympathetic to such an approach in view of its own distinguished history in giving great vigor and maximum protection to these civil rights.

For the foregoing reasons I concur with the result reached by the majority. Justice CLIFFORD joins in this opinion.